Albert D. **BURKE**, Plaintiff–Appellant,

v.

Bruce J. **JOHNSON**, Gary **Vaughn**, and Jackson Township, Defendants–Appellees.

No. 97–3831.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 16, 1998.

Decided Jan. 21, 1999.

John P. Kolesar (argued and briefed), Tiffin, Ohio, for Plaintiff–Appellant.

James P. Nolan II (argued and briefed), Bieser, Greer & Landis, L.L.P., Dayton, Ohio, for Defendants–Appellees.

Before: SUHRHEINRICH and CLAY, Circuit Judges; ROSEN, District Judge.*

---

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

## OPINION

ROSEN, District Judge.

This Section 1983 case calls upon us to resolve questions surrounding the validity of a release-dismissal agreement entered into by Plaintiff Albert Burke as part of his plea agreement in a state criminal proceeding, and the burdens of proof as to the validity of that release as a bar to a subsequent federal civil rights action. The District Court determined that Plaintiff's Section 1983 civil rights action was barred in its entirety by the release given by Burke. For the reasons stated below, we affirm the District Court's decision.

## I. *PERTINENT FACTS*

On February 19, 1996, Defendant Bruce Johnson, Chief of Police of Jackson Township, Ohio, was dispatched to respond to a domestic violence call at the residence of Carla Burke, Plaintiff's ex-wife. By the time Chief Johnson arrived, Mr. Burke had left the area in a Chevrolet pick-up truck. Johnson pursued Burke, caught up with him, and arrested him. According to Chief Johnson, during the arrest Burke attacked him with a screwdriver. According to Burke, Johnson struck him with the butt of his service revolver and with his ASP baton.

Burke was subsequently charged in a five-count indictment in Montgomery County, Ohio with aggravated burglary of Carla Burke's home (count I); domestic violence against Carla Burke (count II); assault on a police officer (count III); grand theft of the Chevrolet pick-up truck (count IV), and fleeing and eluding a police officer (count V).[1] Each of the charges in the indictment carried specifications of prior felony convictions for robbery and possession of weapons while under a disability. *Id.*

The aggravated burglary and domestic violence charges were subsequently dismissed without prejudice and the criminal case against Burke proceeded to trial in the Montgomery County Common Pleas Court on the

---

1. Counts I–IV are felonies under Ohio law. Count V is a first-degree misdemeanor.

remaining three charges in June 1996. After one day of trial, Burke entered into an oral plea agreement on the record, the terms of which were as follows:

1. The dismissal of the aggravated burglary and felonious domestic violence charges would be converted to a dismissal *with* prejudice;

2. The State also agreed to dismiss the assault on a police officer felony charge.

3. Burke agreed to plead guilty to grand theft auto with the prior conviction specification, and would receive a sentence of three to ten years.

4. The State agreed to drop the prior conviction specification on the fleeing and eluding charge and Burke agreed to plead guilty to that charge (without the specification), and any sentence would run concurrently with the grand theft auto charge.

5. The State also agreed to administratively terminate Burke's current probation. (Burke was at that time on probation from another conviction and facing revocation of probation and an additional year in prison upon conviction for any of the instant charges).

6. Burke agreed to give a general release of all claims against the police officers and Jackson Township.

[See Transcript of Proceedings in the Common Pleas Court of Montgomery County on June 11, 1996, pp. 2–4.]

With respect to the general release of claims against the police officers, the agreement was that

[T]he defendant [Burke], his heirs, and assigns warrant ... that he will release now and forever any of the officers associated with the circumstances surrounding this matter, and specifically, Jackson Township Police Department, Chief Johnson, Officer Quigley, Officer West, Detective Vaughn, Montgomery County, the County Commissioners, the Trustees of Jackson Township, and anyone else, so that this is a complete resolution of all matters between the parties in consideration of the State giving up the important

count of felonious assault of a police officer, which is an aggravated felony of the first degree, along with the specification thereto.

Tr. pp. 3–4.

As indicated above, the plea agreement was never reduced to writing. Rather, its terms were delineated by the prosecutor on the record, stipulated to on the record by defense counsel, and agreed to on the record by Burke.

In considering and ultimately accepting, the plea agreement, the trial judge specifically asked Burke whether he understood everything said by the prosecuting attorney and his attorney and asked whether he understood and approved of the terms as represented by the attorneys, to which Burke responded, "Yes." The colloquy between Burke and the trial judge following the attorneys' delineation of the terms of the plea agreement was as follows:

THE COURT: Mr. Burke, do you understand everything that the prosecuting attorney just said?

THE DEFENDANT [Albert Burke]: Yes.

THE COURT: Do you understand everything Mr. Robinson [Burke's attorney] just said?

THE DEFENDANT: Yes.

THE COURT: Do you approve of his negotiations on your behalf in this matter, Mr. Burke?

THE DEFENDANT: Yes.

THE COURT: Before I can accept your plea to the remaining two counts, I have to be sure that you understand everything that has gone on in this courtroom today.

Do you have any questions regarding these plea negotiations, sir?

THE DEFENDANT: No.

THE COURT: Are you now under the influence of alcohol, drugs, or any medication that would affect your ability to understand what I'm saying?

THE DEFENDANT: No.

\*     \*     \*

THE COURT: Are you a citizen of the United States?

THE DEFENDANT: Yes.

THE COURT: How far did you go in school?

THE DEFENDANT: Eleventh.

THE COURT: So you are able to read and write, sir?

THE DEFENDANT: Yes.

Tr. pp. 5–6.

The Court continued its colloquy with Burke regarding his understanding that he was giving up various constitutional rights to a jury trial, to subpoena and cross-examine witnesses, to remain silent, and to require the State to prove him guilty beyond a reasonable doubt. However, in enumerating all of the rights Burke was waiving by agreeing to plead guilty, the Court did not specifically reference or mention the waiver/release of civil claims. The Court then concluded its colloquy with Burke as follows:

THE COURT: Do you have any question about any of the rights I've just gone over with you?

THE DEFENDANT: No.

THE COURT: Any questions at all about what is happening here in this courtroom this morning?

THE DEFENDANT: No.

THE COURT: Are these pleas, sir, being made voluntarily? That means of your own free will.

THE DEFENDANT: Yes.

Tr. pp. 9–10.

Based upon her colloquy with Burke, the Common Pleas judge found that Burke's plea was voluntarily made, and accordingly accepted it:

THE COURT: I find that you understood the waiver and giving up of your constitutional rights, the nature of the offenses, the maximum penalties that can be imposed, and further that it has been explained to you that although you are eligible for probation, the Court does not intend to consider probation.

I further find that you understand the effect of these pleas, that these pleas were made voluntarily, and that there's a factual basis for these pleas. Therefore, I will accept the pleas and order them filed.

\* \* \*

Your attorney has done a good job in negotiating on your behalf and the State of Ohio has been generous as far as negotiations with you as well.

I will accept the recommendations and negotiations entered into on your behalf by Mr. Robinson and the State of Ohio.

Tr. pp. 12–14.

The Court then proceeded to sentence Burke in accordance with the terms of the plea agreement recited by the prosecutor. [Tr. pp. 14–15.]

Six months later, in January 1997, Burke filed this Section 1983 action based upon the alleged actions of Chief Johnson and the Jackson Township police in connection with the February 19, 1996 incident. Based upon the oral release agreed to by Burke in pleading guilty to the criminal charges stemming from that incident, the District Court granted the Defendants' motion to dismiss, and dismissed the case with prejudice.

Burke now appeals.

## II. SUMMARY OF PLAINTIFF'S ARGUMENTS

In seeking reversal of the District Court's decision, Burke argues that his agreement to the release of civil claims was not voluntarily made under the standards set forth in *Town of Newton v. Rumery*, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) and *Coughlen v. Coots*, 5 F.3d 970 (6th Cir.1993).

In *Rumery*, which involved a written release-dismissal agreement, the Supreme Court considered the following factors in determining whether the release was voluntary:

(1) the knowledge and experience of the criminal defendant;

(2) whether the defendant had an attorney and whether the attorney drafted the agreement;

(3) whether the defendant was in jail; and

(4) whether the defendant had time to consider the agreement.

In that case, the Court found the release to be voluntary based upon the following facts:

(1) Rumery was advised by an experienced criminal defense attorney, whose primary goal was to get the criminal charges dismissed;

(2) Rumery's attorney drafted the release agreement;

(3) Rumery discussed the release agreement with his attorney at length and considered it for three days before signing; and

(4) Rumery was not in jail.

Because the release in this case was an oral agreement, Burke argues that the issue of his voluntariness and the satisfaction of the *Rumery* standards should be evaluated under a "clear and convincing evidence" standard, the standard adopted by the Third Circuit in *Livingstone v. North Belle Vernon Borough,* 91 F.3d 515 (3rd Cir.1996).

Plaintiff contends that the District Court erred in taking of judicial notice of the experience of his criminal defense attorney (the experience of the attorney advising a criminal defendant being one of the factors which persuaded the *Rumery* court that the release agreement at issue in that case was voluntary). Plaintiff argues that the District Court abused his discretion and denied him due process in taking judicial notice of the experience of his attorney (and of the Common Pleas judge) without providing him with notice and an opportunity to be heard prior to taking judicial notice.

## III. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Although captioned as a "Motion to Dismiss", because Defendants' motion relied on matters outside the pleadings, as provided in Fed. R. Civ. Pro. 12, the District Court properly treated the motion as a Rule 56 motion for summary judgment.

The general standard that an appellate court applies in reviewing the grant or denial of a summary judgment motion is the same standard utilized by the trial court initially.

*Mitchell v. Toledo Hospital,* 964 F.2d 577 (6th Cir.1992). As provided in Fed. R. Civ. Pro. 56(c), summary judgment shall be rendered forthwith "if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. *STANDARDS FOR EVALUATING RELEASE/DISMISSAL AGREEMENTS*

As indicated above, the standards for evaluating release/dismissal agreements were set forth by the Supreme Court in *Town of Newton v. Rumery,* 480 U.S. 386, 405, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). The facts of that case are as follows. Bernard Rumery read in a newspaper that a grand jury in Rockingham County, New Hampshire had indicted a friend of his, David Champy, for aggravated felonious sexual assault. Seeking to learn more about the matter, Rumery telephoned a Mary Deary, a mutual friend of his and Champy's. Deary, coincidentally, had been the victim of the charged sexual assault and was expected to be the prosecution's chief witness.

Following the phone call from Rumery, Deary called David Barrett, the chief of police for the town of Newton and told him that Rumery was trying to force her to drop the charges against Champy. Rumery again called Deary a month or two later. Deary reported to the police chief that in this second call, Rumery had threatened that if she went forward with the charges against Champy, she would "end up like" two women who recently had been murdered in Lowell, Massachusetts. Barrett then arrested Rumery and accused him of tampering with a witness in violation of New Hampshire state law.

Rumery retained Stephen Woods, a prominent criminal defense attorney. Woods contacted Brian Graf, the Deputy County Attorney for Rockingham County, and warned Graf that he "had better dismiss these charges, because we're going to win and then after that we're going to sue." Graf and

Woods had further discussions and ultimately negotiated an agreement under which Graf would dismiss the charges against Rumery if Rumery would agree not to sue the town, its officials or Deary for any harm caused by the arrest. All parties agreed that one of the reason's Graf agreed not to prosecute Rumery was to protect Mary Deary who did not want to have to testify against Rumery.

Woods subsequently drafted the agreement in which Rumery agreed to release all claims he might have against the town and its officials if the criminal charges against him were dropped. Woods discussed this agreement with Rumery in his office for about an hour and explained to Rumery that he would forego all civil actions if he signed it. Three days later, Rumery returned to Woods' office and signed the agreement.

Ten months later, Rumery filed a § 1983 action in the Federal District Court for the District of New Hampshire alleging that the town and its officers had violated his constitutional rights by arresting him, defaming him and falsely imprisoning him. The defendants moved to dismiss based upon the release/dismissal agreement. Rumery argued that the agreement was unenforceable because it violated public policy. The District Court rejected Rumery's argument and concluded that a release of claims under § 1983 was valid if it resulted from a decision that was voluntary, deliberate, and informed. Finding that these factors were satisfied in Rumery's case, the court granted summary judgment in favor of the defendants. The First Circuit reversed adopting a per se rule invalidating release/dismissal agreements.

The Supreme Court reversed the Court of Appeals and its adoption of a per se rule of unenforceability of release/dismissal agreements, and instead concluded that the validity of such agreements should be determined by courts using "a case-by-case approach [which] appropriately balances the important interests on both sides of the question of the enforceability of these agreements." 107 S.Ct. at 1195 (O'Connor, J., concurring in part and in the judgment). Although the majority did not expressly enumerate those "important interests" which must be balanced, it did conclude that the Rumery

agreement was valid because (1) it was voluntary, (2) there was no evidence of prosecutorial misconduct, and (3) enforcement of the agreement would not adversely affect relevant public policy interests. 107 S.Ct. at 1195 (enumeration added).

With respect to voluntariness, the Court found the Rumery release/dismissal agreement to have been voluntary based upon the following facts:

(1) Rumery was a knowledgeable and experienced businessman and was advised by an experienced criminal defense attorney;

(2) Rumery's attorney drafted the release agreement;

(3) Rumery discussed the release agreement with his attorney and considered it for three days before signing; and

(4) Rumery was not in custody.

107 S.Ct. at 1192–1193 (enumeration added).

The Sixth Circuit construed *Rumery* in *Coughlen v. Coots,* 5 F.3d 970 (6th Cir.1993) and held in that case that before a court may properly conclude that a particular release/dismissal agreement is enforceable, it must specifically determine that *Rumery*'s three "voluntariness, no prosecutorial misconduct, no adverse affect on relevant public interests" factors are satisfied. 5 F.3d at 974. The court further held that "[t]he burden of proving each of these points falls upon the party in the § 1983 action who seeks to invoke the agreement as a defense." *Id.*

The *Coughlen* court further directed lower courts that release/dismissal agreements "should be scrutinized closely in cases where substantial evidence supports [the § 1983 litigant's] allegation of police misconduct, in view of the potential for abuse of release-dismissal agreements by law enforcement officials." *Id.* The court noted that examples of such misconduct would include

situations where, following their use of excessive force, police officers file unfounded criminal charges as bargaining chips to cover up their own conduct or to induce the victim to give up his cause of action; or where a prosecutor, upon discovering that the victim has a meritorious civil claim,

files frivolous criminal charges in order to protect the police officers.

*Id.*

Accordingly, the *Coughlen* court instructed that "should a court conclude that a prosecutor secured a release-dismissal bargain in the face of substantial evidence of police misconduct, the court could take this as evidence of prosecutorial misconduct since it would demonstrate that 'the coercive power of criminal process' was being 'twisted to serve the end of suppressing complaints against official abuse, to the detriment not only of the victim of such abuse, but also of society as a whole.'" *Id.*, quoting *Rumery*, 107 S.Ct. at 1196 (O'Connor, J., concurring in part and in the judgment). On the other hand, where the parties present evidence advancing conflicting versions of the facts giving rise to a Section 1983 litigant's alleged injuries, enforcement is appropriate. *Id.* at 975. *See also, Hill v. City of Cleveland,* 12 F.3d 575, 579 (6th Cir.1993).

The Court will apply the foregoing *Rumery/Coughlen* standards in determining the enforceability of the release/dismissal agreement in this case. As a threshold matter, however, we must determine whether, as Plaintiff argues, the *Rumery/Coughlen* "voluntariness" factor must be proven by a heightened standard of proof.

C. *"CLEAR AND CONVINCING EVIDENCE" IS NOT REQUIRED TO ESTABLISH SATISFACTION OF THE* RUMERY *VOLUNTARINESS FACTOR.*

Plaintiff argues that Defendants here should be required to prove satisfaction of the *Rumery* voluntariness factor by "clear and convincing evidence." In support of this argument, Plaintiff relies upon the Third Circuit's decision in *Livingstone v. North Belle Vernon Borough,* 91 F.3d 515 (3rd Cir.1996), *cert. denied,* 520 U.S. 1142, 117 S.Ct. 1311, 137 L.Ed.2d 474 (1997).

*Livingstone* involved a § 1983 action brought by Frances and Joseph Livingstone, husband and wife, against police officers and municipalities arising out of the conduct of police called to the Livingstone home to respond to a domestic violence incident. On the night in question, Carrie Livingstone, the plaintiffs' 22–year–old unmarried daughter who was living at her parents' home with her 14–month–old son had an argument with her father which resulted in her father striking her on the face, causing her lip to split and bleed. Carrie ran out of the house and across the street to a community ambulance service. An ambulance service employee called the police. When the officers arrived, Carrie told them that her father had struck her and that her parents were holding her son without her consent. After additional police officers arrived, they proceeded to the Livingstone home where Mr. Livingstone permitted them to enter. Following a brief discussion, two officers accompanied Mr. Livingstone outside and told him to go to the nearby police station to make a statement. No charges were filed against Mr. Livingstone that evening or at any later time.

Meanwhile, back at the Livingstone house, the two officers who had the discussion with Mr. Livingstone re-entered the house without a warrant, this time in search of Carrie's son. Mrs. Livingstone had locked herself with her grandson in a back bedroom of the house. When she refused to open the door, one of the officers picked the lock and tried to push the door open. From the partially opened door, Mrs. Livingstone hit the officer with a fishing rod and scratched him. The officers then broke the door down to enter the room and told Mrs. Livingstone she was under arrest.

Mrs. Livingstone testified that both of the officers struck her causing her to lose consciousness and sustain bruises and lacerations. According to the officers, they used force only for the purpose of getting handcuffs on her after she struck the one officer, and a stun gun to subdue her because she was screaming and kicking. They claim that her thrashing about caused them all to fall while removing her from the house and that she refused to get up.

The morning after the altercation, Mrs. Livingstone was charged by the police with disorderly conduct, aggravated assault, terroristic threats, resisting arrest and interfering with custody. She was held over for a

jury trial on all but the terroristic threat charge, and the aggravated assault was reduced to a simple assault.

The case proceeded to trial in the court of common pleas and after the prosecution had concluded its proofs, which included the testimony of Carrie Livingstone followed by the testimony of various police officers and the ambulance service employees, the court dismissed the interference with custody charge. Thereafter, Mr. Livingstone and his son, James, testified for the defense.

Before Mrs. Livingstone was to take the stand, the trial judge met with defense counsel and the prosecutor to discuss whether the matter could be resolved. After settlement negotiations, an on-the-record conference with all parties was held in camera with the trial judge. At this conference, Mrs. Livingstone's attorney summarized the agreement reached with the prosecution by stating that the defense would move for a judgment of acquittal after James Livingstone finished testifying; that expenses for the physical damage to the house and for Mrs. Livingstone's reasonable medical care would be paid; and that once those bills were paid, the Livingstones would execute a full and complete release releasing any and all civil claims they might raise against any of the municipalities or their municipal officials.

In response to the judge's inquiry, all parties voiced their assent to the terms of the settlement. When they returned to the courtroom, the defense moved for a judgment of acquittal on the criminal charges against Mrs. Livingstone, which the court granted.

The release/dismissal agreement, however, was never reduced to writing. Further, the Livingstones never submitted to any of the municipal defendants any medical bills or bills for household repairs and no payments were ever made to them for such expenses.

A year after the court entered a judgment of acquittal on the charges against Mrs. Livingstone, the Livingstones filed a complaint in federal court alleging a Section 1983 action and various state law claims against the police officers and the municipalities involved. Relying on the oral agreement made on the record in the judge's chambers, the defendants moved for summary judgment. The district court granted the defendants' motion. The Third Circuit reversed and remanded the case back to the district court for further findings regarding the voluntariness of the agreement with respect to the Livingstones, concluding the record failed to demonstrate that the Livingstones were fully informed of the nature and scope of the agreement proposed in camera or that there was ever a meeting of the minds. *See Livingstone v. North Belle Vernon Borough,* 12 F.3d 1205 (3rd Cir.1993).[2]

Following remand, the parties cross-moved for summary judgment on various grounds. The court granted partial summary judgment and then conducted a jury trial limited to one question—whether the Livingstones had voluntarily entered into the release/dismissal agreement. The district court instructed the jury that the defendants bore the burden of proof to establish voluntariness and that burden was one of "preponderance of the evidence." 91 F.3d 515, 533. The jury found that the Livingstones did enter into the agreement voluntarily. Accordingly, the district court entered judgment in favor of the defendants and against the Livingstones. The matter was again appealed to the Third Circuit.

On appeal the second time, the Livingstones challenged the district court's "preponderance of the evidence" instruction arguing that the standard should have been one of "clear and convincing evidence." The appellate court agreed.

---

**2.** Although Officer Monack, one of the officers involved in the altercation who participated in the in camera conference and the prosecutor, Assistant District Attorney Heneks, testified in deposition that they believed an agreement had been reached whereby the municipal defendants would pay the bills for medical expenses and household repairs and the criminal charges would be dropped in exchange for the Livingstones' agreement not to sue the officers or their municipal employers, the appellate court was persuaded by Mrs. Livingstone's deposition testimony that she was "confused" as to what was proposed in the agreement and had no idea what she and the prosecution had agreed to. 12 F.3d at 1211.

In reaching the conclusion that, because the Livingstone release/dismissal agreement was an oral one that was never reduced to writing, the standard of proof applicable should be one of "clear and convincing evidence", the Third Circuit relied principally upon comments by Justice Powell in the *Rumery* plurality opinion and by Justice O'Connor in her separate concurring opinion regarding the evidence of voluntariness produced in that case with respect to Mr. Rumery (i.e., that Rumery was a sophisticated businessman who had been represented by competent criminal defense counsel; that Rumery was not in custody when he agreed to the terms and that he considered the matter for three days before signing.) The Third Circuit noted that Justice Powell said that the evidence made it "clear" that Rumery entered into the agreement voluntarily, while Justice O'Connor viewed the evidence presented as being "convincing". 91 F.3d at 534, n. 29, quoting *Rumery*, 107 S.Ct. at 1194, 1197. From these remarks, the Third Circuit determined that the *Rumery* Court *sub silentio* established a clear and convincing standard of proof.

No other circuit has interpreted *Rumery* as having established a clear and convincing standard of proof. Further, as indicated, the *Livingstone* court was particularly persuaded to establish a higher standard of proof because the release/dismissal agreement at issue in the case was an oral agreement. *Livingstone* is the only reported case suggesting that oral release/dismissal agreements should be treated differently than written agreements.

█ We decline to adopt the Third Circuit's "clear and convincing evidence" standard for several reasons. First, we find that reading the release/dismissal agreement into the record in the context of a plea hearing as was done in this case, should be viewed as the equivalent of a written agreement since judicial supervision provides due process protection against prosecutorial overreaching and insures voluntariness under all but the most unusual circumstances. Therefore, a release under these circumstances should be governed by the same "preponderance of the evidence" standard applicable in ordinary civil contract actions. *See generally, Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See also, Ohio State Tie & Timber, Inc. v. Paris Lumber Co.*, 8 Ohio App.3d 236, 240, 456 N.E.2d 1309, 1314 (1982). *Cf., United States v. Robison*, 924 F.2d 612, 613 (6th Cir.1991) (holding that plea agreements are contractual in nature, therefore, in interpreting and enforcing them, traditional principles of contract law apply).

Second, factually, this case is clearly distinguishable from *Livingstone*, and therefore, the Third Circuit's ruling should be limited to the facts of that particular case. As the Defendants here point out, the record in *Livingstone* established that Mrs. Livingstone was confused as to the terms of the agreement in that case. She and her husband further claimed that they never intended to waive their rights to sue. By contrast, in this case, there is nothing of record which suggests that Burke did not understand the terms of the release read or that he did not intend to agree to waive his right to sue the Defendants. All of the record evidence points to the fact that Burke voluntarily and knowingly and with the advice of counsel entered into the release/dismissal agreement. Burke cannot claim that he was confused as to the agreement's terms or that he did not know he was agreeing to release his claims against these Defendants. Indeed, the agreement read into the record to which Mr. Burke verbally assented specifically mentioned his release of all of the officers and law enforcement entities associated with this matter, including specifically the Jackson Township Police Department, Chief Johnson and the other police officer defendants. There being no confusion on the part of Burke and no ambiguity as to the terms of the release, there is no reason in this case to elevate the standard of proof as the Third Circuit did in *Livingstone*.

More importantly, we are persuaded that a simple "preponderance of evidence" standard of proof is sufficient for determining whether an on-the-record oral agreement relinquishing the right to pursue a civil action was voluntarily made in light of the fact that this lesser standard applies in determining the

voluntariness of a criminal defendant's waiver of his constitutional rights. *See, Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (holding that voluntariness of defendant's waiver of his *Miranda* rights is to be established by a "preponderance of the evidence"); *Lego v. Twomey,* 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (voluntariness of a confession established by "preponderance of the evidence"). *See also, Bates v. Meadows,* 358 F.2d 674 (6th Cir.1966) (in habeas corpus action attacking a guilty plea, petitioner required to show by preponderance of the evidence that the plea was not voluntarily and understandingly made). If a preponderance of evidence standard applies when determining if there is a voluntary waiver of a criminal defendant's constitutional rights, we see no reason for application of an elevated standard where lesser rights are implicated.

For these reasons, although we agree that the burden is on the party raising the release and the voluntariness of the release as a defense, we adopt a preponderance of the evidence standard as to these issues.

## D. THE DISTRICT COURT DID NOT ERR IN DETERMINING THAT THE ORAL RELEASE/DISMISSAL AGREEMENT IN THIS CASE IS ENFORCEABLE.

■ Turning next to Plaintiff's substantive argument concerning the enforceability of the release/dismissal agreement in this case, we find that the District Court properly determined that the release/dismissal agreement is enforceable.

■ First, it is clear from the record that Burke voluntarily entered into the agreement. Although the degree of Burke's "sophistication" may not be that of the educated businessman defendant in *Rumery,*

3. Burke raises as one of his issues in this appeal the district court's taking of "judicial notice" of the degree of his attorney's experience. However, this is a non-issue with respect to the *Rumery /Coughlen* voluntariness standard. Essentially, all that courts require is that the plaintiff be represented and counseled by an attorney. *See, Hill v. City of Cleveland, supra; Berry v. Peterson, supra; Woods v. Rhodes,* 994 F.2d 494 (8th Cir. 1993); *Hammond v. Bales,* 843 F.2d 1320 (10th Cir.1988); *Elk v. Townson,* 839 F.Supp. 1047

courts have found the "degree of knowledge and sophistication" factor satisfied where the record establishes that the accused had but a "modest educational background" but was literate, *see Berry v. Peterson,* 887 F.2d 635 (5th Cir.1989), or was "street wise" or "familiar with the criminal process", *see, Lynch v. City of Alhambra,* 880 F.2d 1122 (9th Cir. 1989). Here, the record establishes that Burke had an eleventh grade education, could read and write English, and was "street wise" in that the encounter with the Jackson Township police was not his first contact with the criminal justice system; he had a lengthy criminal history. Further, as the District Court observed, when he agreed to the release/dismissal agreement, Burke was represented by competent counsel, an attorney who has been in practice in the Dayton, Ohio area for more than 25 years and was an Assistant U.S. Attorney in Chicago before coming to Dayton.[3]

The record further establishes that Plaintiff and his attorney both specifically indicated that Burke's attorney had discussed with him the terms of release/dismissal agreement. While it is true that, unlike *Rumery,* the release/dismissal agreement here was not reduced to writing, the parties did have the benefit of judicial supervision. As the *Rumery* Court observed, "the possibility of abuse is clearly mitigated if the release-dismissal agreement is executed under judicial supervision." 107 S.Ct. at 1196 (O'Connor, J., concurring). Furthermore, as the District Court in this case observed, the release/dismissal agreement having been entered into as part of a plea agreement, and Judge Donovan's finding that Plaintiff's guilty plea was voluntary, renders Burke's claim that the civil release was involuntary "less than credible." Accordingly, we find that Burke entered into the release/dismissal agreement voluntarily.[4]

(S.D.N.Y.1993); *Poling v. Ferguson,* 878 F.Supp. 880 (N.D.W.Va.1995). Since no finding as to the specific degree of experience of counsel is required, the fact that the District Court observed that Plaintiff's counsel had 25 years experience, including experience as a federal prosecutor, does not present a reversible error.

4. We note that even if we were persuaded that the issue of whether Plaintiff entered into the

With respect to the second *Rumery /Coughlen* factor, that of no prosecutorial misconduct, Burke argues that he has raised an inference of prosecutorial misconduct by virtue of the fact that there are discrepancies among the accounts of some of the police officers regarding Chief Johnson's actions on the evening in question. However, as the District Court noted, the existence of discrepancies among the accounts of prosecution witnesses does not amount to "substantial evidence" of police misconduct such that an inference of prosecutorial misconduct under *Coughlen* arises.

As the District Court found, the charges against Burke were not "unfounded criminal charges" used as "bargaining chips" to cover up police misconduct. Indeed, there were independent civilian (i.e., non-police) victims on three of the five counts in the indictment and Judge Donovan found that there was an adequate factual basis for conviction on the two counts to which Burke pled guilty.

Turning to the final *Rumery /Coughlen* factor, the public interest element, the *Coughlen* court stated that this prong of the *Rumery* test can be met by demonstrating that "obtaining the release was motivated by an independent, legitimate criminal justice objective." 5 F.3d at 975. The prosecutor in this case stated on the record before Judge Donovan that the release was added to the plea agreement to achieve finality to the litigation between the parties. As the District Court observed, the *Coughlen* court suggested that this is an adequate public interest:

> ... [E]nforcing releases in those circumstances [as part of a plea bargain] furthers an important public interest by protecting law enforcement officers from the considerable burden of defending against unwarranted civil claims.

5 F.3d. at 974, citing *Rumery.*

Having determined that all of the *Rumery /Coughlen* factors are satisfied in this case,

we find that the oral release/dismissal agreement entered into by Plaintiff is enforceable. Therefore, the District Court properly relied upon the release/dismissal agreement in granting the Defendants' motion to dismiss.

## CONCLUSION

For all of the foregoing reasons, the Decision and Order of the District Court is AFFIRMED.

---

release/dismissal agreement voluntarily should be evaluated under a "clear and convincing" standard of proof as argued by Plaintiff, we would find even under this heightened standard of proof that Plaintiff voluntarily entered into the agreement. The record of this case quite clearly and convincingly establishes that Burke entered into the agreement voluntarily. His voluntariness is clearly indicated in the plea transcript and Burke has produced no evidence whatsoever to contradict this evidence.