In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-1514

ROBERTO GONZALEZ and
GLORIA HOLLAND,

*Plaintiffs-Appellants*,

*v.*

NICHOLAS KOKOT and
DEVERICK DIXON

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 C 304—**Allen Sharp**, *Judge.*

ARGUED SEPTEMBER 20, 2002—DECIDED DECEMBER 27, 2002

Before EASTERBROOK, RIPPLE, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* This appeal comes to us from a grant of summary judgment in favor of two East Chicago, Indiana police officers. A Chicago, Illinois police officer and his friend brought this § 1983 lawsuit, alleging that their constitutional rights had been violated when the East Chicago officers wrongfully arrested them and used excessive force in doing so. This lawsuit by Roberto Gonzalez and Gloria Holland faced an immediate hurdle, however, given that they had previously executed releases of any claims they might have had against the East Chicago officers. They nevertheless proceeded with

their lawsuit, on the theory that the releases they signed were invalid and unenforceable either as a matter of contract law or as violating public policy. Because we agree with the district court that the releases are valid and thus fully enforceable, we affirm the grant of summary judgment.

## I. History

### A. The Arrest of Gonzalez and Holland

The § 1983 claims asserted by Gonzalez and Holland arose out of an April 10, 1999 incident that began when Officers Nicholas Kokot and Deverick Dixon[1] were dispatched to an address on Drummond Avenue in East Chicago, Indiana. Upon their arrival, the two officers began to move pieces of wood and concrete sitting in the street onto the grassy area between the street and the sidewalk. Gonzalez, apparently unhappy with the transfer of the wood from the street to a position in front of his house, opened the door of his home and complained to the officers that the wood was damaging his lawn. The officers responded that if Gonzalez wanted the wood removed, he would have to speak with city officials.

From this point, the precise details of the encounter are somewhat unclear, but it is undisputed that Gonzalez and the officers continued to exchange words. According to the version advanced by Gonzalez, he initially spoke to the officers in a calm, measured tone, but as the interchange continued, Gonzalez admits to raising his voice, apparently making liberal use of profanity throughout the exchange. There is some disagreement as to the ex-

---

[1] Deverick Dixon has since had his name legally changed to Janci Mumba. As a matter of convenience, this opinion will continue to refer to him as Dixon, as did the district court.

act warning Officer Kokot then gave Gonzalez; Kokot asserts that he told Gonzalez to lower his voice, redirect his anger, or be arrested. Gonzalez claims that Kokot said nothing about lowering his voice. Gonzalez admits that he then began to belittle Kokot, and that in doing so he was "yelling, but not 'at the top of top of [*sic*] his lungs.'" (Appellant Br. at 8.)

The interchange between Gonzalez and the officers culminated in Officer Kokot's attempt to arrest Gonzalez. Gonzalez acknowledges resisting Kokot's effort to handcuff him, holding back his unrestrained arm to avoid being cuffed and attempting to stand up after Kokot put him on the ground. During this arrest attempt, Gonzalez's companion Gloria Holland came out of the house and attempted to position herself between Kokot and Gonzalez, asking the officers not to arrest him while she grabbed Gonzalez's uncuffed arm. She refused Dixon's request to stop interfering with Gonzalez's arrest, which led Dixon to grab her arm and arrest her as well. Holland twice withdrew her arm from his attempt to handcuff her, leading Dixon to place her on the ground to finish handcuffing her.

Gonzalez was charged with disorderly conduct in violation of Indiana Code § 35-45-1-3(2),[2] and with forcibly resisting, obstructing, or interfering with a law enforcement officer in violation of Indiana Code § 35-44-3-3(a)(1).[3]

---

[2] Section 35-45-1-3(2) provides that "[a] person who recklessly, knowingly, or intentionally . . . makes unreasonable noise and continues to do so after being asked to stop . . . commits disorderly conduct." Ind. Code § 35-45-1-3(2) (2002).

[3] Section 35-44-3-3(a)(1) provides: "A person who knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while
(continued...)

Holland was charged solely with resisting law enforcement. The charges against Gonzalez and Holland were brought in East Chicago City Court, where Gerald Kray, a Deputy Prosecuting Attorney for Lake County, was assigned the case. The defendants retained attorney Jeffrey Schlesinger.

## B. The Releases

On or about February 28, 2000, while the criminal charges against Gonzalez and Holland were pending, their attorney Schlesinger served the City of East Chicago with a Notice of Tort Claim, asserting the claim that Officers Kokot and Dixon had arrested Gonzalez and Holland without probable cause and with the use of excessive force, violating their constitutional rights. Schlesinger also told prosecutor Kray of the tort claim, and Kray relayed this information to the East Chicago Law Department, as apparently was his practice, by calling Roy Dominguez, corporation counsel for East Chicago. Thus, Kray became aware of the civil rights claim to be filed by the defendants.

According to Schlesinger, he initiated plea discussions with Kray sometime after the charges were filed. During these discussions, Schlesinger told Kray that Gonzalez was a Chicago police officer and that Gonzalez would face job repercussions if he were found guilty or were to plead guilty. At some point, the issue of releases was introduced into the discussions. According to Kray, it was Schlesinger who first offered signed releases of

---

[3] (...continued)
the officer is lawfully engaged in the execution of his duties as an officer . . . commits resisting law enforcement . . . ." Ind. Code § 35-44-3-3(a)(1) (2002).

claims if Kray would agree to a plea arrangement that led to a dismissal of the charges against his clients. Schlesinger, on the other hand, testified that Kray indicated that it was the City of East Chicago that was requiring releases from the defendants in return for its consent to a dismissal of the charges. Kray also testified that it was his practice to obtain the consent of the arresting officers before dismissing any criminal charges and that Kokot and Dixon wanted releases from Gonzalez and Holland before they would provide their consent to any dismissal.

In any event, the prosecutor, Schlesinger, and Kokot and Dixon reached an agreement providing for dismissal of the criminal charges in exchange for the release of any claims by Gonzalez and Holland—an arrangement known as a release-dismissal agreement. Sometime after the issue was introduced into the plea discussions, releases were prepared by the East Chicago Law Department and forwarded to Schlesinger. The releases were signed by Gonzalez and Holland, in the presence of their lawyer, on June 14, 2000. The releases provide in part:

> For the sole consideration of ZERO ($0.00) dollars, the receipt and sufficiency whereof is hereby acknowledged, the undersigned hereby releases and forever discharges Nicholas D. Kokot, Officer, Officer Deverick Dixon, Frank Acala, Chief of Police, Mayor Robert A. Pastrick, Office of the City Attorney, East Chicago Police Department and the City of East Chicago . . . from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever, and particularly on account of all injuries, known or unknown, both to person and property, which have resulted or may in the future develop from an accident which occurred on or about the 10th day of August, 1999, at 3723 Drummond Street, East Chicago, Indiana . . . .

(Pl.'s Ex. 1 & 2.) Schlesinger delivered the executed releases to Kray in court on the day the criminal charges against Gonzalez and Holland were dismissed.

## C. *The § 1983 Lawsuit*

On April 19, 2001, less than one year after the dismissal of criminal charges against them, Officer Gonzalez and his friend Holland brought this § 1983 suit against Officers Kokot and Dixon, raising their original Fourth Amendment claims. Kokot and Dixon moved for summary judgment, raising the executed releases as an affirmative defense to these claims.

In opposing the officers' motion for summary judgment, Gonzalez and Holland argued that the releases they signed were not supported by consideration and thus invalid under traditional principles of contract law. Additionally, they argued that even if the releases were contractually valid, they were nonetheless unenforceable as against public policy. The district court held that the releases were valid and thus barred the lawsuit, noting "[t]his Court has no doubt whatsoever that these plaintiffs executed these releases freely and voluntarily and with the advice of counsel, and that these releases are valid and enforceable." The district court accordingly entered summary judgment in favor of Kokot and Dixon.

## II. Analysis

We review a grant of summary judgment *de novo*, viewing all the facts, and drawing inferences from those facts, in a light most favorable to the nonmoving party. *Furnish v. SVI Systems, Inc.*, 270 F.3d 445, 448 (7th Cir. 2001). Gonzalez and Holland argue that summary judgment in favor of the arresting officers was improper, essentially raising the same arguments presented to the district court

in opposition to the motion: that the releases they executed were invalid and unenforceable—and therefore imposed no bar to their lawsuit.

Gonzalez and Holland contend that the prosecutor in their case was aware that Kokot and Dixon did not have probable cause to arrest them, that the prosecutor should have thus simply dismissed the charges against them rather than act as the private representative of the arresting officers in securing the releases, and that the releases were not subject to judicial supervision as they were not made part of the record in the criminal case when the charges were dismissed.

### A. Indiana Contract Law

We first consider the appellants' argument that the releases they signed are invalid under Indiana contract law. Under Indiana law, a valid release bars any subsequent lawsuit on the claims covered by the release. *McWaters v. Parker*, 995 F.2d 1366, 1370 (7th Cir. 1993) (citing *Lechner v. Reutepohler*, 545 N.E.2d 1144, 1147 (Ind. Ct. App. 1989)). It is not disputed that the language of the releases at issue here, if valid, would cover and bar the claims asserted by Gonzalez and Holland against the officers.

Instead, the appellants argue that the releases are invalid. "Under Indiana law, release agreements are to 'be interpreted in the same manner as any other contract document, with the intention of the parties regarding the purpose of the document governing.'" *Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 562 (7th Cir. 2002) (quoting *Huffman v. Monroe County Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992)). Indiana law requires that a release be supported by consideration to be valid. *Bogigian v. Bogigian*, 551 N.E.2d 1149, 1151 (Ind. Ct. App. 1990) (citing *Pope v. Vajen*, 22 N.E. 308 (Ind. 1889) and *Gates v. Fauvre*,

74 N.E. 155 (Ind. App. 1918)). In addition, the parol-evidence rule prohibits courts from considering evidence outside the four corners of an agreement unless the terms of that agreement are ambiguous. *Deckard*, 307 F.3d at 563; *Thomas v. Thomas*, 577 N.E.2d 216, 219 (Ind. 1991) ("When a contract is unambiguous, the intent of the parties should be determined by the language employed in the document." (citations omitted)).

In this case, Gonzalez and Holland argue that the language of the releases clearly indicates that they were not supported by consideration. They note that both releases state on their faces that "ZERO ($0.00)" was the "sole consideration" given for the release of claims, and that Indiana's parol-evidence rule prohibits a court from taking notice of any facts beyond this language.

We cannot say, however, that the terms of these release agreements are clear and unambiguous. Certainly, it is not clear why Gonzalez and Holland, counseled by their attorney, would enter into an agreement that would be unenforceable from the beginning. The fact that these releases were drafted to indicate that "ZERO ($0.00)" was given as consideration—a curious statement given that "nothing" generally is not "given" as consideration—suggests that the term was meant to reflect something else, not that the agreements were invalid from the outset. Most likely, the "ZERO ($0.00)" consideration term was included to reflect the fact that no *monetary* consideration was given in exchange for the releases. But at the very least, this term creates an ambiguity in the release agreements that requires the use of parol evidence to interpret the agreements in such a way as to give full effect to the intentions of the parties.

Even when viewed in a light most favorable to the nonmoving parties, the evidence here clearly shows that the releases signed by Gonzalez and Holland were sup-

ported by consideration. They bargained for and received dismissal of the criminal charges against them in exchange for their release of any claims they had against the arresting officers or the city. Consideration need not be monetary; the dismissal of criminal charges was certainly something of value to Gonzalez and Holland, especially in light of Gonzalez's concern for his job as a Chicago police officer. *Cf. Dye v. Wargo*, 253 F.3d 296, 301 (7th Cir. 2001) (finding a release of § 1983 claims valid under Indiana law because although the § 1983 plaintiff "did not get cash for his settlement . . . he did receive value (avoidance of any debt that might hang over him after prison)"). The city lived up to its end of the bargain by consenting to the dismissal of the criminal charges; Gonzalez and Holland cannot now claim that they're not bound to live up to theirs. We find that the release-dismissal agreement here was a valid contract, supported by adequate consideration, under Indiana law.

## *B. Federal Public Policy*

The appellants next argue that even if the releases are valid under Indiana contract law, this release-dismissal agreement is unenforceable as against federally declared public policy. They contend that Kokot and Dixon have failed to prove that the releases were given voluntarily, that the prosecutor acted improperly to protect the private interests of the police officers despite his knowledge of police misconduct, and that the agreement was not subject to judicial supervision.

The potential for the abuse of release-dismissal agreements has led the Supreme Court to urge the use of a critical eye when courts are asked to enforce them. *See Town of Newton v. Rumery*, 480 U.S. 386, 392-93 (1987). But despite the risk of misuse, as Gonzalez and Holland acknowledge, the Supreme Court has explicitly rejected a

rule of *per se* invalidity of these agreements. *Id.* at 392. Rather, the Court noted that while "in some cases these agreements may infringe important interests of the criminal defendant and of society as a whole," *id.* at 392, in general release-dismissal agreements "may further legitimate prosecutorial and public interests," *id.* at 397 (plurality opinion). The Court therefore chose to follow, in Justice O'Connor's words, "a case-by-case approach [, which] appropriately balances the important interests on both sides of the question of the enforceability of these agreements." *Id.* at 399 (O'Connor, J., concurring).

According to *Rumery*, before enforcing a release-dismissal agreement, a court must find that the agreement was "voluntary, that there [was] no evidence of prosecutorial misconduct, and that enforcement of this agreement would not adversely affect the relevant public interests." *Id.* at 398. The burden of proving the validity of a release-dismissal agreement is on the party seeking to enforce the agreement. *See id.* at 399 (O'Connor, J., concurring) ("[I]t is the burden of those relying upon such covenants to establish that the agreement is neither involuntary nor the product of an abuse of the criminal process."). Justice O'Connor's concurring opinion in *Rumery* provides additional guidance as to the types of factors a court should examine when determining the validity of a particular release-dismissal agreement:

> Many factors may bear on whether a release was voluntary and not the product of overreaching, some of which readily come to mind. The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. The nature of the criminal charges that are pending is also important, for the greater the charge, the greater the coercive effect. The existence of a legitimate criminal justice objective for ob-

taining the release will support its validity. And, importantly, the possibility of abuse is clearly mitigated if the release-dismissal agreement is executed under judicial supervision.

*Id.* at 401-02 (O'Connor, J., concurring). We now turn to an examination of these factors in this case.

### 1. *Voluntariness*

According to the Court in *Rumery*, a valid release-dismissal agreement must be the result of "an informed and voluntary decision." *Id.* at 393. In that case, the Court focused on several factors in evaluating whether the agreement at issue had been entered into voluntarily. The Court noted that Rumery was a "sophisticated businessman," that he was not in jail at the time he signed the release, that he was counseled by "an experienced criminal lawyer," and that the benefits of the agreement to Rumery were "obvious." *Id.* at 394. Taken together, these factors indicated that Rumery had "voluntarily waived his right to sue under § 1983." *Id.*

While the decision in *Rumery* requires that release-dismissal agreements be the result of voluntary decisions, neither the Supreme Court nor this Court have yet addressed the question as to what standard of proof is required to prove the voluntariness of a release-dismissal agreement. Several circuits have previously addressed this question, coming to different conclusions as to what the standard should be.

The Third Circuit has held that the voluntariness of an oral release-dismissal agreement, like the agreement at issue in this case, must be proven by clear and convincing evidence. *See Livingstone v. North Belle Vernon Borough*, 91 F.3d 515, 535-36 (3d Cir. 1996). The Third Circuit reasoned that a heightened standard of proof was nec-

essary because release-dismissal agreements "implicate 'important individual interests or rights'"—namely, the redressing of possible constitutional-rights violations. *Id.* at 535 (quoting *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). In addition, a clear and convincing standard was thought to provide "the salutary effect of reducing the overall risk of misunderstandings in the conclusion of release-dismissal agreements, and increasing the accuracy of juries' decisions as to whether a release-dismissal agreement was concluded voluntarily." *Id.* at 536.

The Sixth Circuit reached a different conclusion, holding that voluntariness need only be proven by a preponderance of the evidence. *See Burke v. Johnson*, 167 F.3d 276, 285 (6th Cir. 1999). In *Burke*, the court addressed the voluntariness of an oral release-dismissal agreement read into the record at a plea hearing. While the court noted that an on-the-record agreement presented less serious problems of proof than an oral agreement like the kind addressed by the Third Circuit in *Livingstone*, it went on to observe that a preponderance-of-the-evidence standard is considered sufficient for determining the voluntariness of waivers of other constitutional rights. *Id.* at 284-85 (noting that a preponderance standard is used to determine the voluntariness of a waiver of *Miranda* rights, the voluntariness of a confession, and the involuntariness of a guilty plea attacked in a habeas proceeding). The court then concluded that, "[i]f a preponderance of evidence standard applies when determining if there is a voluntary waiver of a criminal defendant's constitutional rights, we see no reason for application of an elevated standard where lesser rights are implicated." *Id.* at 285.

We agree with the Sixth Circuit that the voluntariness of a release-dismissal agreement need only be proved by a preponderance of the evidence. The preponderance standard is sufficient to ensure that a release of claims is en-

tered into voluntarily, just as it has proven sufficient for determining the voluntariness of waivers of constitutional rights. In addition, the burden of proving voluntariness remains on the party seeking to invoke the agreement, further safeguarding against coerced or involuntary releases.

Under a preponderance standard, it is apparent that the releases signed by Gonzalez and Holland were the product of voluntary and informed decisions. The record indicates that Gonzalez and Holland signed the releases as the result of a voluntary choice, with a full understanding of the consequences. Gonzalez, as a Chicago police officer, undoubtedly had an understanding of the criminal-justice process. Both Gonzalez and Holland were represented by counsel who had actively bargained with the prosecutor for a dismissal of charges, and the possibility of a release-dismissal agreement had been under discussion for a significant period of time, giving Gonzalez and Holland—and their attorney—ample time to consider the consequences of signing the releases. Gonzalez and Holland had their attorney present when they actually signed the releases. And the benefits of the release-dismissal agreement to Gonzalez especially are obvious: he avoided potential problems with his job as a Chicago police officer. Given these facts, considered in light of *Rumery*, the execution of these releases was neither involuntary or uninformed.

## 2. *Legitimate Prosecutorial Conduct*

Also important to the Supreme Court's analysis in *Rumery* was the fact that "the prosecutor had an independent, legitimate reason to make this [release-dismissal] agreement directly related to his prosecutorial responsibilities." *Rumery*, 480 U.S. at 398. Such a legitimate reason ensures that the prosecutor acts consistent with his

duties to uniformly enforce the criminal law, rather than as the agent for the private interests of potential § 1983 defendants. In this case, we believe that the prosecutor did not engage in any improper conduct inconsistent with his role as prosecutor, nor were his efforts in securing the releases from Gonzalez and Holland the result of any prosecutorial overreaching.

First, the prosecutor did not act improperly when he pursued the charges against Gonzalez and Holland. The appellants go to great lengths to argue that the pursuit of charges against them was wholly unjustified. In disputing the disorderly conduct charge, they admit that Gonzalez was yelling, but argue that it was not "at the top of top of [*sic*] his lungs." In challenging the charges of resisting law enforcement, they admit that they offered some resistance during the arrest attempt, but that their resistance was not "forcible." They also point to inconsistent accounts given by Officers Kokot and Dixon in their depositions as evidence of misconduct and apparent complicity by the prosecutor in ignoring the inconsistencies. But as the Sixth Circuit has noted, "the existence of discrepancies among the accounts of prosecution witnesses does not amount to 'substantial evidence' of police misconduct such that an inference of prosecutorial misconduct" arises. *Burke*, 167 F.3d at 286. Even accepting Gonzalez's and Holland's characterization of the charges, we believe that there was enough evidence to send the criminal case to the trier of fact. The charges brought against Gonzalez and Holland were certainly not "unfounded criminal charges used as bargaining chips to cover up police misconduct." *Id.* (quotations omitted).

Second, the prosecutor did not abandon his responsibilities in securing the releases from Gonzalez and Holland. Prosecutors may legitimately consider the strength of the defendants' § 1983 claims when considering whether to enter into a release-dismissal agreement. *See Rumery*, 480

U.S. at 396 (plurality opinion) ("To the extent release-dismissal agreements protect public officials from the burdens of defending such unjust [§ 1983] claims, they further this important public interest."); *id.* at 399 (O'Connor, J., concurring) ("[T]here are substantial policy reasons for permitting release-dismissal bargains to be struck in appropriate cases. Certainly some § 1983 litigation is meritless, and the inconvenience and distraction of public officials caused by such suits is not inconsiderable."). We cannot say that it would have been inappropriate for Prosecutor Kray (as well as Gonzalez and Holland themselves) to have considered the strength of the § 1983 case in deciding whether or not to enter into a release-dismissal agreement.

In addition, the plurality opinion in *Rumery* noted that "[p]rosecutorial charging decisions are rarely simple." *Id.* at 396 (plurality opinion). Prosecutors must consider the strength and importance of a particular case, government enforcement priorities, and the appropriate allocation of scarce prosecutorial resources. *Id.* Justice O'Connor's concurring opinion in *Rumery* notes that "[s]paring the local community the expense of litigation associated with some minor crimes for which there is little or no public interest in prosecution may be a legitimate objective of a release-dismissal agreement." *Id.* at 399-400 (O'Connor, J., concurring) (citation omitted). In this case, prosecutor Kray testified in his deposition that "[t]his was a very minor case that got out of hand." (Kray Dep. at 10.) Avoiding a potentially costly and lengthy trial over relatively minor matters, with a settlement that was acceptable to both sides, was certainly a legitimate goal related to Kray's duties as a prosecutor.

### 3. *The Public Interest*

Finally, we cannot say that enforcement of the releases in this instance will be to the detriment of any public

interest. The plurality opinion in *Rumery* noted that release-dismissal agreements might "tempt prosecutors to trump up charges in reaction to a . . . civil rights claim, suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights." *Id.* at 394 (quotation omitted) (plurality opinion). These agreements thus raise the potential of harm to the public's interests in the proper and uniform enforcement of criminal laws and in seeing episodes of police misconduct adequately addressed.

We see no evidence of harm to either of these public interests by the enforcement of the releases signed by Gonzalez and Holland. As discussed above, the charges against them were not trumped up in response to their § 1983 suit; the record indicates that there were colorable cases against each. Nor does the record indicate that Gonzalez and Holland will be left with any significant constitutional violations unredressed. They did, after all, receive something of value in exchange for the dismissal of their § 1983 claims: the dismissal of the criminal charges against them and the avoidance of the time and expense of a criminal trial.

The lack of judicial supervision is also not fatal to this agreement's enforceability. The *Rumery* Court acknowledged that while "it would be helpful to conclude release-dismissal agreements under judicial supervision . . . . such supervision is not essential to the validity of an otherwise proper agreement." *Rumery*, 480 U.S. at 398 n.10. Because we find that the release-dismissal agreement at issue in this case was entered into voluntarily, without evidence of prosecutorial overreaching, we do not believe that the lack of judicial supervision by itself renders these releases unenforceable. Rather, we believe Kokot and Dixon have adequately demonstrated that the agreement comports with public policy.

### III. Conclusion

The releases signed in this case were part of a contractually valid release-dismissal agreement, fully consistent with considerations of public policy. Because we find them valid and enforceable, the releases must serve to bar this § 1983 suit. The grant of summary judgment in favor of Officers Kokot and Dixon is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
