Carlos A. JIMENEZ, Plaintiff,

v.

Scott BRUNNER, Kenne Bass, Ken Killian, M. Davis, D. Roberts, W. Van Midgley, Murray City, Defendants.

No. 2:00–CV–954 TS.

United States District Court,
D. Utah,
Central Division.

Aug. 3, 2004.

Patrick F. Holden, Salt Lake County Attorneys Office, Salt Lake City, UT, for Salt Lake County.

Mr. Andrew M Morse, Heather S. White, Snow Christensen & Martineau, Salt Lake City, UT, Harry H. Souvall, Hall & Evans, Denver, CO, for Scott Brummer, Kenne Bass, Ken Killian, M. Davis, D. Roberts, W. Van Midgley, Murray City.

Ms. Kathryn Collard, Law Firm of Kathryn Collard LC, Salt Lake City, UT, Thomas E. Beck, Law Offices of Thomas E Beck & Assoc, Los Angeles, CA, for Carlos A. Jimenez.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND MEMORANDUM ORDER

STEWART, District Judge. ·

### I. INTRODUCTION

This matter came before the Court for a *Rumery* [1] hearing to determine if Plaintiff's Release–Dismissal Agreement should be enforced as a bar to this § 1983 action.

Plaintiff brings this § 1983 action against the officers involved in his arrest and the prosecuting attorney, alleging violations of his rights in connection with his arrest and subsequent plea bargain. Defendants raise the affirmative defense that Plaintiff released his claims against them as part of what is commonly called a release-dismissal agreement. At the close of the *Rumery* evidentiary hearing on the enforceability of the Agreement, the Court ruled orally that the release/dismissal was voluntary and that therefore the case would be dismissed.

However, upon careful review of the entire record now before the Court, it finds that the Defendants' counsel failed to be candid in disclosing relevant information to opposing counsel and to the Court, and that the concealed information changes the Court's finding on the issue of voluntariness. Accordingly, the Court denies De-

---

**1.** *Town of Rumery v. Newton,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987)

fendants' Motion and will send the issue of voluntariness of the release-dismissal agreement to the jury.

## II. FINDINGS OF FACT

An evidentiary hearing was held on the *Rumery* issues on February 25–26, 2003. The post-hearing briefing continued through September 9, 2003. Based upon the entire record in this case, the Court makes the following Findings of Fact and Conclusions of Law, for the purposes of determining the enforceability of the Release–Dismissal Agreement.

Late on the night of December 12, 1998, Murray City Police responded to a 911 call from Gordon Youngblood. He asked if a squad car could be sent to check on his girlfriend, Diana Romero, in Murray, because she has just reported to him that a former boyfriend was at her driveway and she was worried.

The 911 operator then called Ms. Romero, who confirmed the information from Mr. Youngblood and reported that Carlos Jimenez was inside her house. The 911 call records Ms. Romero speaking to Mr. Jimenez while she was simultaneously on the phone with the 911 operator. Ms. Romero repeatedly asked Mr. Jimenez to leave. Ms. Romero told the 911 operator that Mr. Jimenez was really drunk, desperate and depressed and had threatened his own life. She then reported to the 911 operator the following sequence of events: Mr. Jimenez returned to his car, then returned to try her doorknob, returned to his car to turn his lights off and on, backed up and stopped. Police officers arrived, officers asked Mr. Jimenez to get out of his car, he did not obey, an officer drew his weapon and other officers arrived. The 911 call ended when one officer knocked on Ms. Romero's door to check on her.

Mr. Jimenez was subsequently taken into custody by Murray City Police officers and charged with criminal trespass, Utah Code Ann. § 76–6–206; violation of the open container statute, § 41–6–44.20; public intoxication, Utah Code Ann. § 76–9–701; interfering with an arrest, Utah Code Ann. § 76–8–305; and disorderly conduct, Utah Code Ann. § 76–9–102.

On January 6, 1999, Mr. Jimenez was arraigned on those charges in the Third District Court. He pleaded not guilty. The record of the January 6, 1999, arraignment reveals that Mr. Jimenez was not represented by counsel and the Third District Court judge conducting the arraignment did not inform Mr. Jimenez of his right to an attorney or obtain a waiver of counsel from Mr. Jimenez before accepting his plea. The January 6, 1999, audiotape is the evidence that Defendants failed to timely disclose to Plaintiff's counsel and the Court.

On January 15, 1999, Mr. Jimenez filed a request under the Government Records Access Management Act (GRAMA) with Valley Communication Services requesting a copy of the 911 tape and obtained the tape.

After the arraignment, the Murray City Prosecutor's Office determined it had a conflict of interest that prevented it from prosecuting Mr. Jimenez's case. It was arranged that Van Midgley, of the Sandy City Prosecutor's Office, would handle the Jimenez case. At the time of his assignment as prosecutor for Mr. Jimenez's case, Mr. Midgley was an experienced prosecutor with a very extensive experience in regularly prosecuting numerous domestic violence cases. Mr. Midgley's experience in such cases is that the offenders and victims usually have a close relationship and often when the offender is prosecuted, he

or she blames, and takes their anger out on, the victim. Mr. Midgley regularly uses pleas in abeyance in such cases, finding them to be beneficial to the victim, the offender, the prosecution and the public. In particular, in his experience, the victims benefit because the plea in abeyance requires that the offender not violate the law for a certain time and comply with conditions such as attending counseling.

Mr. Jimenez's case was set for a pretrial conference on April 12, 1999. In preparation for the pretrial conference, Mr. Midgley reviewed the following: the dispatch call information, police reports generated by Officers Bass and Brummer as a result of the December 12, 1998, incident; photographs of Mr. Jimenez taken by the officers after the incident; the 911 tapes; police reports arising from a different incident on December 21, 1998, where Mr. Jimenez was found parked for hours at a Little Caesar's parking lot within sight of Ms. Romero's home; and Mr. Jimenez's criminal history, including a battery conviction arising out of a domestic dispute in the early 1990s.

The police reports of the incident state that Mr. Jimenez initially refused to get out of the car, and when he finally did, he refused the officers' orders to get down on the ground, was very loud and abusive and extremely intoxicated; an alcoholic beverage was found in the car and he suffered a scraped nose and broken glasses when he was handcuffed. Based upon his review of the records, Prosecutor Midgley believed that Mr. Jimenez was under-charged.

On April 12, 1999, Mr. Jimenez appeared for the pretrial conference. He was not in custody at the time. He was an intelligent, college educated,[2] 41 year-old who had recently lost his job as a professional at a community college.

Mr. Midgley and Mr. Jimenez met before the pretrial conference. Mr. Jimenez handed Mr. Midgley a recantation letter he said was from Ms. Romero. Mr. Jimenez denied he trespassed on Ms. Romero's property, had been drunk, refused to comply with the officers' orders and he had been disorderly. He claimed that the officers were racially prejudiced and they broke his glasses and hurt his back when arresting him. He also claimed the officers slashed his tires. He told Mr. Midgley that he had contacted Murray City's risk management department about his glasses and tires.

Based on his review of the file, including the 911 tape and photographs, Mr. Midgley did not believe Mr. Jimenez. Based on his past experience in domestic violence cases, Mr. Midgley concluded that Ms. Romero's letter was consistent with an abuser's ploy to get the victim to recant, that the relationship may be volatile, and that Ms. Romero was being manipulated and controlled by Mr. Jimenez. Mr. Midgley also concluded that Mr. Jimenez saw himself as a victim and that he might file a lawsuit against the Murray City Police officers.

In accordance with his common practice in domestic abuse cases, Mr. Midgley offered Mr. Jimenez a plea in abeyance under the following terms: Mr. Jimenez would plead guilty or no contest to the charges of interference with a police officer and disorderly conduct; the other three charges would be dismissed, with prejudice; Mr. Jimenez would not violate the law for twelve months; Mr. Jimenez would attend anger management classes;

---

2. Mr. Jimenez attended college but did not graduate.

and Mr. Jimenez would pay Court costs. In addition, Mr. Migley conditioned the plea in abeyance on Mr. Jimenez signing a "hold harmless" agreement releasing the officers, Murray City and Mr. Midgley from all civil claims. In exchange, if Mr. Jimenez was in full compliance at the end of the nine months, all charges would be dismissed. Mr. Midgley testified that he explained the "hold harmless" agreement to Mr. Jimenez.

Mr. Midgley believed that such a plea in abeyance would benefit the prosecution in that it would save prosecutorial resources because, among other reasons, further proceedings would take him away from his Sandy City duties and Ms. Romero's recent recantation letter made her a reluctant witness, making prosecution difficult. For the same reasons, he believed that the plea in abeyance would preserve judicial resources. He concluded that such a plea would also benefit Ms. Romero because she would not need to testify in protracted legal proceedings or be blamed or manipulated by Mr. Jimenez. He believed that the plea in abeyance would benefit Mr. Jimenez in that he would obtain counseling and not have the convictions on his record. From his conversation with Mr. Jimenez, he believed that Mr. Jimenez saw himself as a victim, had a problem with authority and was willing to offer a document, the Romero Letter, which Mr. Midgley considered to be a false document. Based on those impressions, Mr. Midgley, believed that the plea in abeyance conditioned on a "hold harmless" provision would save the officers and City the "untold resources, time, money and manpower" in what he considered to be a potential, but frivolous, lawsuit.

Mr. Jimenez responded by negotiating for the plea in abeyance on more favorable terms as follows: the 12–month period reduced to 9 months, no payment of Court costs and the anger management counseling through IHC, the provider of his choice.

Mr. Midgley did not question Mr. Jimenez about his not having counsel, and did not ask if he had waived counsel or explain to Mr. Jimenez that he had a right to counsel, because he believed, mistakenly, that those things had been covered in the January 6, 1999, arraignment. He did not offer Mr. Jimenez more time to consider the agreement they had just negotiated.

Mr. Midgley and Mr. Jimenez then presented their agreement to Judge Fratto of the Third District Court. Mr. Midgley explained that they had agreed to a plea in abeyance, asked the Court to dismiss three counts, asked that Mr. Jimenez be allowed to plead no contest to the disorderly conduct and interference counts and explained the other conditions. The Court did not inform Mr. Jimenez that he had the right to counsel for the purpose of considering his plea. Nor did the Court ascertain that Mr. Jimenez knew he had the right to counsel at the plea stage and had waived that right. The Court's plea colloquy is as follows:

> The Court: And you understand that a no contest plea, although not an admission of guilt, will be treated the same way as guilty plea, and that is that on the disorderly conduct you could go to jail for ninety days and $925, and the interference you could go to jail for six months and $1,850.
>
> And you are entitled to certain rights, you don't have to plead no contest or guilty, you could plead not guilty and require that the City prove that you are guilty beyond a reasonable doubt, and

are entitled to *a speedy public trial with the assistance of an attorney.* If you can't afford one, I would appoint one to represent you.

You're entitled to this trial, a jury of four people, they could only convict you if they all decided that you were guilty. If they did decide that you were guilty, you would have a right to appeal. And you still have that right to appeal. And you still have that right to appeal, but if I sentence you within what the law permits me to sentence you to, there's not too much to appeal. Now, a plea in abeyance, and I'm certain you understand that, but let me just see if you have any questions. Which is I take your plea, in this case a no contest, and I hold it for nine months, I give you certain conditions, you fulfill the conditions, at the end of the nine month period the matter is dismissed. If you fail in any of the conditions, then you're brought back to the be sentenced, and that's when these possible maximum sentences I've described have some importance. But, hopefully, we do not get to that point. Any questions about that procedure—

Mr. Jimenez: No.

The Court:— that you have?

Mr. Jimenez: No, I don't.

The Court: Well, I'm going to take your plea under advisement for a period of nine months and the conditions are these; (1) that there be no violations of the law in any jurisdiction, that you complete whatever program has been developed at [IHC] in terms of anger management.

And would it make some sense to set a date by which that-that there must be a demonstration of the completion of that program. . . .

Mr. Midgley: Your honor, we discussed that, and I believe he's comfortable with thirty days.

Mr. Jimenez: That's right.

The Court: So that we would look for a letter then by the—I guess it would be the—let's make it the 21st of May, if that's agreeable, for that letter. And then you're going to execute a hold harmless agreement with Murray City, and that needs to be taken care of by— shall we set that the same time period, the 21st of May by which that is to be done.

Mr. Midgley: That would be fine, Judge.

The Court: And are those agreeable conditions with you, Mr. Jimenez?

Mr. Jimenez: Tell me what I'm responsible for, Your Honor, on the no [sic] harmless.

The Court: To hold harmless the City from any liability I suppose is what they're interested in, and as a condition of a plea in abeyance.

Mr. Jimenez: They'll draw the agreement?

The Court: That's correct.

Mr. Jimenez: They'll do that, and then will they contact me—

Mr. Midgley: We will.

Mr. Jimenez:— and I will *sign it or -*

Mr. Midgley: We will.

Def.'s Ex. H (underlined emphasis added).

Prior to the discovery of the audiotapes of the April 12, 1999, hearing, Mr. Midgley submitted an affidavit to this Court that characterized the plea colloquy as follows:

Before entering the plea, the judge discussed with Jimenez the fact he was

waiving his right to sue the City and any of its employees in the future. He asked Jimenez if he understood he was giving up these rights and if his agreement to do so was voluntary. Jimenez told the judge he understood the rights he was waiving and that his decision to do so was voluntary.

Defendants' Memorandum in Support of Defendants' Motion for Order Declaring Waiver of Attorney–Client Privilege by Plaintiff, Ex. C at ¶ 7 (Affidavit of Van Midgley). As shown by the actual proceedings, that representation was mistaken or overstated.

Thirty days following the April 12, 1999, pretrial conference where Mr. Jimenez changed his plea was May 11, 1999. On May 11, 1999, the "hold harmless" agreement had not yet been drafted. On May 26, 1999, the Murray City Prosecutor's office drafted and sent to Mr. Midgley a proposed "Settlement Agreement, Release of Claims, Stipulation and Judgment & Order of Dismissal" (Release–Dismissal Agreement) reflecting the terms of the plea in abeyance, the dismissal of three charges and Mr. Jimenez's release of civil claims. Ex. K at 69.

At Mr. Midgley's request, Mr. Jimenez came into his office in late June or early July 1999, to pick up and review the agreement. Mr. Jimenez and Mr. Midgley met to discuss the Release–Dismissal Agreement. Among other things, Mr. Midgley told Mr. Jimenez that if he did not sign it, he would be sentenced on his already entered and accepted plea. Mr. Jimenez did not sign it at that time.

On July 7, 1999, Judge Fratto held a hearing on an Order to Show Cause on the uncompleted conditions of the plea in abeyance. Mr. Jimenez appeared but Mr. Midgley did not. The Court informed Mr. Jimenez of a potential conflict arising from his prior representation of Mr. Midgley many years before and offered to re-assign the case to another judge. In his statements to the Court, Mr. Jimenez referred to his meeting with Mr. Midgley the week before and made no allegation of any improper conduct by Mr. Midgley. Mr. Jimenez reported to the Court that he had fulfilled the condition of anger management counseling. He also reported his ongoing negotiations for damages with Mr. Midgley and with the attorney who was handling risk management for Murray City. Those negotiations involved his claimed damages from the December 12, 1998, incident. The proceedings included the following exchange:

> The Court: And I presume that Mr. Midgley remembers that fact, but he may not even remember that fact [of the prior representation].
>
> Mr. Jimenez: I went to his office last week and we had a one-on-one discussion about this, and I think he was aware he was supposed to be here. ... As I was leaving his office, I thought I mentioned to him that I'll see you next week I guess.
>
> *   *   *   *   *   *
>
> Mr. Jimenez: But I think, if I could just update you, because I met with him, as I mentioned, last week, and I also spoke with Mr. Critchfield of Murray City regarding trying to bring some sort of satisfaction [sic] resolution to this.
>
> *   *   *   *   *   *
>
> The Court: Mr. Jimenez, we've attempted to contact Sandy, and apparently Mr. Midgely is in another Court. As I said, they were sent notice,—— so I presume

they have decided they didn't want to be here.

Let's deal with this, It is an Order to Show Cause on a plea in abeyance. There was a plea in abeyance, and the conditions were . . .

And then you were to— Oh, the judgment doesn't say provide a letter, it says hold harmless Murray City by the 21st of May. . . .

\*     \*     \*     \*     \*     \*

Mr. Jimenez: You're right, Your Honor, as far as signing the document or providing a letter stating— holding Murray City harmless has— has not been produced. However, *when I met with Mr. Van Midgely last week, they have a letter, they just want me to sign it.*

And—And, as I explained to him last week in his office, is that since we came to Court a few months ago and decided that those two things would be— needed to completed in order for this to be resolved, I have had some side effects, if you will from those injuries on 12 December. I thought my rotator cuff would be completely healed by now, it hasn't been, there's still a lot of pain.

I'm a marathon runner, and, as you can tell, I haven't been running at all. And— And so it's been— so I approached Mr. Midgley that I'd like to resolve this in all sincerity, but I need to walk away from this with some sort of personal satisfaction because of the circumstances in which things happened on that night with the police officers.

The Court: Uh huh.

Mr. Jimenez: And he said that, well, what you need— he couldn't make that decision, so he asked me to contact the risk management office of Murray City— they handle these kinds of situations through their City Attorney's Office. I spoke with Mr.— one of the attorneys there, Mr. Critchfield.

\*     \*     \*     \*     \*     \*

The Court: Well it seems to me that a plea in abeyance usually works this way, and that is, you've entered your plea of guilty, which I'm holding for this nine month period, and the conditions were the conditions, at the time the plea in abeyance was entered, were the acceptable conditions with everybody, agreeable conditions.

And the idea being that if you fulfill your end of the bargain, that at the end of the nine month period this matter is dismissed. If you fail, however, in any of the conditions, then we would proceed to sentencing.

Mr. Jimenez: Uh Huh.

The Court: *So it's not a matter of going back, if you will, to square one, the plea has been taken, and I'm just holding it for you to fulfill your end of the bargain.*

\*     \*     \*     \*     \*     \*

The Court: . . . But, as you know, Mr. Jimenez, a no contest plea will be treated the same way as a guilty plea in terms of the sentencing, and that is these are Class B misdemeanors.

Mr. Jimenez: Uh huh.

The Court: And so that could be the possible sentence on these. And so *the question really is whether you are— whether you admit or deny this deficiency in the plea in abeyance agreement. If you admit it, then I set that plea in abeyance aside and we would proceed to sentencing.*

Mr. Jimenez: So the trial is by-passed then?

The Court: Well, yes, *there's no trial because a plea has been entered.*

Def.s' Ex. I at 7–12 (underlined emphasis added).

The Order to Show Cause hearing was re-set for July 29, 1999, and subsequently re-set for August 12, 1999.

On July 7, 1999, following the Order to Show Cause hearing, attorney Tom Rasmussen was appointed to represent Mr. Jimenez. Mr. Jimenez and Mr. Rasmussen met on August 6, 1999. At that meeting, Mr. Rasmussen answered Mr. Jimenez's questions concerning his criminal case, the plea in abeyance, the ramifications to him of the plea in abeyance and of a conviction, and the proposed Release–Dismissal Agreement. Mr. Jimenez told Mr. Rasmussen that the police had been more aggressive with him then they should have been. Mr. Rasmussen explained to him that pleas had to have been withdrawn in writing 30 days after they are rendered and that even a timely motion to withdraw a plea was "iffy." Tr. at 167. They reviewed the proposed Release–Dismissal Agreement. Mr. Rasmussen explained to Mr. Jimenez that if he did not sign, he would be sentenced and also explained the range of sentences that Mr. Jimenez could expect. Because Mr. Rasmussen had been appointed to represent Mr. Jimenez in the criminal case, he did not counsel Mr. Jimenez regarding the merits of the release of the potential civil claims. Mr. Jimenez did not sign the Release–Dismissal Agreement and said he wanted to sleep on it.

In Mr. Rasmussen's experience, it was not routine for a plea in abeyance to include a release of civil claims. He testified that the practice in the Third District Court regarding informing defendants of their rights, including rights to counsel, had significantly changed since the events in question, which occurred at a time when the standard written form advising of rights was seldom used in misdemeanor cases.[3]

Anne Zdunich, Mr. Rasmussen's paralegal, testified that on August 10, or 11, 1999, she telephoned the Murray District Court and asked the clerk for a copy of the Release–Dismissal Agreement and received a copy by fax from the prosecutor. She further testified that on August 11, 1999, Mr. Jimenez came to Mr. Rasmussen's office and signed the Release–Dismissal Agreement in her presence but that he expressed reluctance in doing so. She testified that she then put the signed copy in a file for Mr. Rasmussen to take to Court the following day.

At the evidentiary hearing, Mr. Rasmussen testified that, at the time of the hearing he understood that Mr. Jimenez had signed the Release–Dismissal that morning, but that he was not present when it was signed and that he did not receive the faxed document.

In support of the testimony that the document was faxed on the 11th, Defendants submitted a fax cover sheet from Mr. Midgley to Ms. Zdunich dated August 11, 1999. The fax cover sheet is one of several pages from the prosecutor's file that was not produced to Plaintiff's counsel until the day before the evidentiary hearing, long after counsel had taken the depositions of Mr. Midgley and Ms. Zdunich.

---

**3.** The practice changed after *Alabama v. Shelton,* 535 U.S. 654, 122 S.Ct. 1764, 152 L.Ed.2d 888 (2002).

Mr. Jimenez did not attend the August 12, 1999, hearing. However, his attorney, Mr. Rasmussen, and Mr. Midgley attended and the following proceedings were recorded:

Mr. Rasmussen: ... I was appointed on this case, and I believe I was appointed because an Order to Show Cause had been filed in this matter, the issue of the Order to Show Cause being an unsigned release that Mr. Jimenez was to sign with respect to Murray City.

He came in and saw me in my office, we discussed it at length in my conference room, *and today he showed up at my office* and signed the settlement agreement that was faxed to us or provided to us by Mr. Midgley, working on Murray City's behalf.

I now have a copy— excuse me— an original that has been signed by Mr. Jimenez and by Mr. Midgley. If I can submit that to the Court, I believe that resolves the Order to Show Cause. And based on Mr. Jimenez's appearance at my office and signature on the document, we told him that he would not have to appear today, because we had talked to Van and that's all he was after.

\* \* \* \* \* \*

The Court: If, for some reason, you feel uncomfortable I disclosed that fact to you I represented Mr. Midgley, ... I'll give the matter for further disposition to Judge Burton.

Mr. Rasmussen: No. As a matter of fact, I'm hearing about this for the very first time, and the reason I mention that is I think it's significant that Mr. Jimenez did come to my office, we had a very lengthy discussion about his situation, and at no time did he ever indicate to me an uncomfortable feeling with Your Honor sitting on the case ....

\* \* \* \* \* \*

Mr. Rasmussen: And I'm trying to remember what he mentioned to me. And I can't remember if he told me he was doing that or if he had finished it [the anger management requirement]. But one of the things that struck me as we were in search of getting his signature on this letter to resolve the Order to Show Cause was that I was left with the impression that he was basically doing everything else that was asked of him, and it seems silly at this point to jeopardize his plea in abeyance based on that signature, especially given the fact that any thirty day period to appeal or to withdraw a plea or to do anything more material had already run its course, and so he came in and signed the agreement as provided. But—

The Court: Well, it appears to me— let me say this, it appears to me, as I look through this settlement, that this does incorporate one of the conditions, which was releasing Murray City from liability on the matter.

Mr. Rasmussen: Correct.

Mr. Midgely: That's correct.

The Court: Which he has signed.

Mr. Rasmussen: Which I thought was the sole issue of the Order to Show Cause.

The Court: ... So I think maybe the best way to handle this is I will not at this time sign the settlement agreement. I think this now at least works the process in terms of releasing— while I should not make any judgment, make no judgment on that, but it appears to me if you're satisfied that this complies with releasing Murray City from liability, then that will suffice for that aspect of it, ....

\* \* \* \* \* \*

The Court: Well, as I say, then I won't sign this as a sort of final settlement, but make that part of the record in terms of releasing Murray City from liability....

Ex. J, at 3–8 (underlined emphasis added).

On September 3, 1999, Mr. Jimenez sent a letter to Judge Fratto, alleging that he signed the Release–Dismissal Agreement,[4] under coercion due to verbal and physical threats. Ex. K, at 079. At the end of the nine-month plea in abeyance period, Mr. Jimenez's case was dismissed in accordance with his plea agreement.

In contrast to the testimony of Mr. Midgley, Mr. Rasmussen and Ms. Zdunich, Mr. Jimenez testified that on August 12, 1999, he met with Mr. Midgley in Mr. Midgley's office to discuss the Release–Dismissal Agreement and signed it at that time. Mr. Jimenez claims that during this alleged August 12, 1999, meeting with Mr. Midgley, he was threatened by Mr. Midgley that if he did not sign the agreement, he was going to go to prison and that he signed only due to Mr. Midgley's threats and intimidation. Mr. Jimenez denies meeting with his attorney, Mr. Rasmussen, on August 6, 1999, denies having signed the agreement in Mr. Rasmussen's office and says he did not discuss the Release–Dismissal Agreement with Mr. Rasmussen until after he had already signed it on August 12, 1999, in Mr. Midgley's office. Mr. Jimenez's testimony is contradictory on what he says was agreed upon at the pretrial conference on April 12, 1999. First he testified that a release was not mentioned, then he said only a diversion was discussed, then he admitted that he did not remember one way or the other if

Mr. Midgley had mentioned the "hold harmless" provision. He also testified that he did not remember if Judge Fratto had mentioned the "hold harmless" agreement during the plea colloquy. Tr. 284–85.

Mr. Jimenez also relied on the testimony of his long-time friend and sometimes girlfriend, Grace Horton, who testified that she had taken Mr. Jimenez to Mr. Midgley's office during the "second week of August" 1999. Ms. Horton has loaned Mr. Jimenez approximately $43,000. He has not repaid her any of that amount. However, she says she hopes to eventually be repaid. Ms. Horton testified that while waiting for him as he met with Mr. Midgley, she overheard yelling from Mr. Midgley's office. Mr. Jimenez exited the office, according to Ms. Horton, looking distressed and a short time later told Ms. Horton that Mr. Midgley had threatened to throw him in prison unless he signed, and that he felt so afraid that he signed the Release–Dismissal Agreement.

At the close of the evidentiary hearing, the Court found that Mr. Jimenez's claimed meeting in Mr. Midgley's office on August 12, 1999, did not take place. Having observed Mr. Jimenez's demeanor and heard his testimony, the Court found Mr. Jimenez's testimony completely lacking in any indicia of credibility. For example, during his testimony he claimed to be unable to clearly remember any date or event, except for facts supporting the purported August 12, 1999, meeting. He denied meeting with Mr. Midgley before the July 7, 1999, hearing, although he four times told Judge Fratto that he had done so and clearly explained it had been a "one-on-one" meeting with Mr. Midgley to discuss the Release–Dismissal Agreement.

---

4. The letter refers to the Release–Dismissal Agreement as a "letter of agreement" and a "letter."

Similarly, the Court found that Ms. Horton's testimony was not credible and was motivated by the considerable debt Mr. Jimenez owes to her as well as by their personal relationship.

## III.  PROCEDURAL BACKGROUND

On November 12, 2000, Plaintiff filed this § 1983 action.  Among his claims is one based on his allegations that, at the purported August 12, 1999, meeting, Mr. Midgley used physical and psychological coercion, duress and threats of imprisonment to force him to sign the Release–Dismissal Agreement.  Defendants filed a Motion (1) to Enforce Release–Dismissal Agreement;  (2) for Evidentiary Hearing on Enforceability of Release–Dismissal Agreement;  and (3) for Partial Summary Judgment re:  Defendant Midgley.

Pursuant to *Rumery*, the Court set the matter of the enforceability of the Release–Dismissal Agreement for an evidentiary hearing.  Because an enforceable Release–Dismissal Agreement would cover Plaintiff's claims against Mr. Midgley as well as the officers, the Court reserved ruling on Motion for Partial Summary regarding Mr. Midgley's claim of prosecutorial immunity until after the enforceability had been determined.

As his statements at the April 12, 1999, pretrial conference show, it is clear that Mr. Jimenez was an active and intelligent participant in negotiating his plea, in initiating negotiations with a separate Murray City attorney regarding his claim of damages, and in dealing with his Third District Court appearances.  However, in view of the material tape concealed by Defendants, the Court cannot find that Defendants have met their burden of showing that Mr. Jimenez voluntarily signed the Release–Dismissal Agreement.

Shortly before the hearing, during the hearing, and pursuant to his 124–page objection to the Defendants' proposed findings and conclusions, Plaintiff has asserted that Defendants have intentionally failed to disclose information material to his claims.

After the hearing, Plaintiff submitted additional evidence, consisting of the audiotape of the January 6, 1999, arraignment.  Plaintiff contends this previously concealed audiotape is newly discovered evidence that shows that the Release–Dismissal Agreement was not voluntary or, at the very least, raises an issue of fact on voluntariness.

The record does not contain a full explanation of how and when the various audiotapes were discovered.  On April 18, 2002, counsel represented that the Administrative Office of the Utah State Courts had responded to Defendants' subpoena with the information that the criminal file, including audiotapes of the Third District Court proceedings, had been destroyed.  See Def.s' Mem. in Support of Def.s' Motion for Order Declaring Waiver of Attorney–Client Privilege, ¶ 10 at 4.

On September 12, 2002, Defendants moved to file transcripts of the audiotapes of the April 12, 1999, hearing;  the July 7, 1999, hearing;  and the August 12, 1999, hearing.  The supporting memorandum represents the following:

> 1.  On or about March 12, 2002, defendants served a subpoena upon the Clerk of the Third District Court seeking all Court records from Plaintiff's State Court action.  Defendants' counsel was informed that all records had been destroyed pursuant to expungement and therefore did not pursue enforcement of the subpoena.

> \*    \*    \*    \*    \*    \*

3. In mid-August 2002, counsel for defendants discovered that tapes of Court proceedings in the state matter still existed. While the Court system destroys expunged files, it retains tapes of the Court proceedings, because the tapes record all proceedings for that session of Court. After consultation with the Clerk of the Court and reference to the subpoena and this Court's prior order mandating that the Salt Lake County Jail produce their records even though expunged, counsel obtained the tapes from the Clerk of the Court.

*Id.* at 2.

Plaintiff objected to the transcripts, because among other things, they had not been timely produced in discovery. Defendants' counsel responded with a vague explanation of their delay in informing Plaintiff's counsel of the existence of the audiotapes. Determining they were directly relevant, the Court ordered the parties to attempt to stipulate to transcripts of the three available audiotapes or to submit the originals.

At the evidentiary hearing held on February 25, 1999, Plaintiff's counsel questioned Mr. Midgley whether Mr. Jimenez had been advised of his rights at arraignment. Mr. Midgley testified that although he was not present, he assumed that Plaintiff had been informed of his right to counsel and waived that right. Tr. at 89–91. Additionally, he responded to the Court's questioning on the subject testifying that, in his experience, these rights were provided at the arraignment. Tr. at 100–02.

The hearing continued the following day. The Court questioned Mr. Jimenez's appointed counsel, Mr. Rasmussen, regarding the previous day's testimony as to the practice of advising defendants of the right to counsel at arraignments, and whether it was unusual not to have obtained counsel. Tr. 180–184.

According to what Defendants' counsel now represent to the Court, they obtained the audiotape of the January 6, 1999, arraignment, after the first day of the evidentiary hearing. However, nothing was mentioned by Defendants' counsel regarding the audiotape of the January 6, 1999, arraignment despite the Court's on-going questions to witnesses about that very arraignment. Instead, having evidence to the contrary, Defendants knowingly fostered the Court's erroneous finding that right to counsel had likely been given at the January 6, 1999, arraignment, without correcting the record. Defendants' counsel then prepared proposed findings memorializing that ruling, all without disclosing to the Court or to opposing counsel the existence of this very relevant piece of information.

Plaintiff's current counsel, Ms. Collard, eventually discovered the existence of the concealed audiotape.[5] Plaintiff's counsel objected to the findings of fact and conclusions of law proposed by Defendants' counsel and sought additional discovery on the issue of the concealed audiotape.

Defendants' counsel responded by simply changing his proposed findings to delete the finding that counsel had known was erroneous when he submitted it to opposing counsel. Defendants' counsel then blames *Plaintiff's* current counsel for not doing *her* homework and timely discovering the January 6, 1999, audiotape before the hearing and bringing it to the Court's and Mr. Rasmussen's attention when he testified on the second day of the

**5.** The date she discovered it is not in the record.

evidentiary hearing. Reply Mem. in Support of Proposed Findings of Fact and Conclusions of Law and Opposing Plaintiff's Motion to Conduct Additional Discovery, at 6.

Without so much as an apology to opposing counsel and the Court for this unbelievable decision to conceal the audiotape, Defendants' counsel favors the Court with only the following brief, and altogether vague, version of the events in response to Plaintiff's counsel's charge of unethical conduct[6] in preparing the knowingly erroneous draft findings:

Counsel accuses defendants' counsel of withholding this tape during discovery. This is not true. Defendants' counsel's office did not obtain the tape until the early evening of February 25, 2003, the day of the first hearing.

*Id.* at 6 n. 1.

At the time defense counsel drafted the [proposed] Findings and Conclusions, he was aware of an audiotape of the arraignment where Plaintiff pleaded not guilty that did not reveal that he was not informed of his rights. The audiotape was not in evidence, and because there are several methods by which defendants at arraignments are informed of their rights, which might not be reflected on the tape, the draft findings included only the evidence developed by the Court and plaintiff's counsel on issue.

Second, defendants' counsel never offered the subject evidence to the Court. As the transcript reflects, the evidence [of usual procedures at arraignments in 1999] was developed solely through the plaintiff's counsel's question of Mr. Midgley, the Court's questioning of Mr. Midgley, and the Court's questioning of Mr. Rasmussen. Third, ... the evidence is immaterial ... Finally, even if the evidence is material, defendants' counsel took "reasonable remedial measures" by offering to stipulate for the admission of the January 6, 1999 audio tape. Plaintiff's counsel refused that stipulation. Despite that refusal, defendants' counsel took a further remedial step by removing from the [proposed] Findings any reference as to whether or not Mr. Jimenez received his constitutional rights at the January 6, 1999 arraignment.

' In any event, plaintiff's objection is moot because the [proposed] Findings that were submitted do not make any reference to rights being given at the arraignment, and correctly state that Plaintiff was informed of his rights on April 12, 1999, before he changed his plea.

*Id.* at 7–8. (footnote omitted). A footnote that comes before the preceding text consists of speculation by counsel regarding whether Mr. Jimenez might have been advised of his rights by some means other than by the judge presiding at the arraignment.

At the evidentiary hearing, Plaintiff's counsel attempted to make a record that the day before the hearing, she had, for the first time ever, been given copies of pages from the prosecutor's file. These materials included a fax cover sheet dated August 11, 1999, used by Defendants at the evidentiary hearing as evidentiary support for their witnesses' testimony that

---

**6.** For allegedly violating Rule 3.3(a) of the Utah Rules of Professional Conduct R. Prof. Conduct 3.3(a) ("A lawyer shall not knowingly: (1) Make a false statement of material fact or law to a tribunal; ...., or (4) Offer evidence that the lawyer knows to be false").

Mr. Jimenez signed the Release–Dismissal Agreement on that date.

At the hearing, this Court accepted Defendants' counsel's explanation that he believed it may have been produced earlier or obtained from a different source.[7] Tr. at 75–6. The Court chided defense counsel and Defendant Midgley for inappropriately sloppy discovery practices, Tr. at 756, but found that the information missing from the file was not material. However, in view of the fact that it was subsequently revealed that other relevant evidence was concealed, it now appears to the Court that the fax cover sheet may be material. And the Court believes that having that material fax cover sheet sprung on opposing counsel the day before the evidentiary hearing, but long after she had taken the related witnesses' depositions, was prejudicial.

## IV. DISCUSSION AND CONCLUSIONS

■ In *Rumery,* the U.S. Supreme Court considered the issue of enforceability of release-dismissal agreements against a claim that such agreements were *per se* unenforceable as against public policy. In *Rumery,* as in the present case, there was an agreement between the prosecution and a criminal defendant in which the defendant waived his right to sue under § 1983 in exchange for a promise to dismiss the criminal charges. The Supreme Court rejected the argument that such agreements should be *per se* invalid and enforced the agreement because it concluded that the record established that the "agreement was voluntary, that there is no evidence of prosecutorial misconduct, and that the en-

forcement of this agreement would not adversely affect the relevant public interest." 480 U.S. at 398, 107 S.Ct. at 1195. In her concurring opinion in *Rumery,* Justice O'Connor stated that "it is the burden of those relying upon such covenants to establish that the agreement is neither involuntary nor the product of an abuse of the criminal process." *Id.* at 399, 107 S.Ct. 1187. The standard for proving voluntariness is preponderance of the evidence. *Gonzalez v. Kokot,* 314 F.3d 311, (7th Cir.2002) *cert denied,* 539 U.S. 915, 123 S.Ct. 2279, 156 L.Ed.2d 131 (2003).

Justice O'Connor also discussed the following factors as relevant to the court's decision:

> Many factors may bear on whether a release was voluntary and not the product of overreaching, some of which come readily to mind. The knowledge and experience of the criminal defendant and the circumstances of the execution of the release, including, importantly, whether the defendant was counseled, are clearly relevant. The nature of the criminal charges that are pending is also important for the greater the charge, the greater the coercive effect. The existence of a legitimate criminal justice objective for obtaining the release will support its validity. And importantly, the possibility of abuse is clearly mitigated if the release-dismissal is executed under judicial supervision.

480 U.S. at 401–02, 107 S.Ct. 1187. Also relevant may be whether the criminal defendant is in custody, the time he has to consider the agreement before signing it, the criminal experience of counsel, *Rumery,* 480 U.S. at 394, 107 S.Ct. 1187, wheth-

---

7. In view of the letter dated February 24, 2003, Pl.'s Obj. at Ex. 20, it appears Defendants' counsel was aware at the evidentiary hearing that the fax cover letters were not previously provided.

er the criminal defendant expressed any unwillingness and whether the release is clear on its face. *Woods v. Rhodes,* 994 F.2d 494, (8th Cir.1993) (listing factors and collecting cases). *See also Hammond v. Bales,* 843 F.2d 1320 (10th Cir.1988) (granting summary judgment in favor of former prosecutor on the basis he was entitled to absolute prosecutorial immunity because his actions in obtaining release-dismissal agreement as part of plea bargain were wholly within the scope of his prosecutorial function).

Plaintiff contends that the voluntariness of the Release–Dismissal Agreement in this case is relevant to his § 1983 claim and therefore a pretrial evidentiary hearing determining voluntariness violates his Seventh Amendment right to a jury trial. Plaintiff raised this contention prior to the evidentiary hearing and repeats it approximately 58 times in his 124–page Objections to Defendants' Proposed Findings and Plaintiff's Newly Discovered Evidence Supporting Objections.

The Court does not agree. In *Rumery,* the defendants raised the release-dismissal agreement in their Motion to Dismiss. The trial Court held an evidentiary hearing on the issue of voluntariness, and it is evident from the Court's discussion of the record that the Court heard testimony and made credibility determinations.[8] While the issue is not clear from the case law, the Court concluded that, as in *Rumery,* an evidentiary hearing to determine voluntariness was appropriate. However, as the Court noted in its ruling granting Plaintiff's Motion for an evidentiary hearing, it is possible that the Court would

determine after the hearing that there was an issue of fact on voluntariness necessary for jury resolution. *See Livingstone v. North Belle Vernon Borough,* 91 F.3d 515, 523 (3rd Cir.1996) (finding material issue of fact for jury on release-dismissal agreement).

In the present case, the Court finds that several of the *Rumery* factors fall clearly in favor of finding that the Release–Dismissal Agreement was voluntary. Those factors include the following: Mr. Jimenez was not in custody at the time he agreed to the plea agreement or at the time he signed it. Plaintiff was an educated and intelligent professional. He actively and successfully bargained for more favorable conditions, including a decrease in the time, not to pay any costs and to use the counseling provider of his choice. His sophistication and intelligence is shown by that successful bargaining as well as the facts that, before the pretrial conference, he had obtained the 911 tape and visited with City personnel about risk management.

In addition, the nature of the criminal charges against Mr. Jimenez were misdemeanors. As such they "were relatively minor thus limiting the coerciveness of the possibility that he would be convicted." *Hill v. City of Cleveland,* 12 F.3d 575, 577 (6th Cir.1993).

There was judicial supervision of the Release–Dismissal Agreement being a condition of Mr. Jimenez's plea in abeyance.[9] Further, Mr. Jimenez did not actually sign the Release–Dismissal Agreement until he had considered it for several months and had discussed his obligation to sign it "one-

---

**8.** See 480 U.S. at 397 n. 8, 107 S.Ct. 1187 (discussing testimony and trial Court's credibility determination).

**9.** However, as noted in *Gonzalez,* 314 F.3d at 321, a lack of judicial supervision would not, by itself, render a release invalid.

on-one" with the prosecutor and with his own court-appointed lawyer. His court-appointed lawyer was experienced and knowledgeable and fully explained the consequences of not complying with the condition that he sign a "hold harmless" provision.

However, several factors weigh against finding the agreement was voluntary. Most important is Mr. Jimenez's lack of counsel at the time he orally agreed to the Release–Dismissal Agreement as a condition of his plea in abeyance. Not only was Mr. Jimenez not represented, he was never informed that he had the right to counsel to consider his plea, or that if he could not afford one, one would be appointed for the purpose of representing him in connection with his plea. Second, that there was no written Release–Dismissal Agreement for him to review at the time he agreed to such a release. Third, that he entered his plea immediately after it was negotiated, without an opportunity to consider the written form of the release.

A brief background of Utah's 30–day withdrawal of plea period and Rule 11 requirements are necessary to understand why the lack of counsel at the January 6, 1999, and April 12, 1999, hearings is so significant. In 1999, Utah law provided:

(2) (A) A plea of guilty or no contest may be withdrawn only upon good cause shown and with leave of court.

(B) A request to withdraw a plea of guilty or no contest is made by motion

and *shall be made within 30 days after entry of the plea.*

Utah Code Ann. § 77–13–6 (1980) (underlined emphasis added).[10]

At the time of the January 6, 1999, arraignment; the April 12, 1999, Pretrial conference; and the two Order to Show Cause hearings later in 1999, the prosecutor, the State Court judge and Mr. Jimenez's appointed counsel, Mr. Rasmussen, were proceeding under the understanding that the 30–day period began to run on April 12, 1999, when Mr. Jimenez entered his plea in abeyance. As noted above, the Release–Dismissal Agreement was not even prepared during the 30–day period. Thus, Mr. Jimenez did not see its terms until after the time for withdrawing his plea had already ended.

Pursuant to Utah Code Ann. § 77–2a–3(1), acceptance of a plea in anticipation of a plea in abeyance shall be done in full compliance with Utah Rule Criminal Procedure 11. Rule 11 has many requirements for acceptance of a plea including the following:

(a) Upon *arraignment,* except for an infraction, *a defendant shall be represented by counsel, unless the defendant waives counsel in open court.* The defendant shall not be required to plead until the defendant has had a reasonable time to confer with counsel.

(b) A request to withdraw a plea of guilty or no contest, except for a plea held in abeyance, shall be made by motion before sentence is announced. Sentence may not be announced unless the motion is denied. For a plea held in abeyance, a motion to withdraw the plea shall be made within 30 days of pleading guilty or not contest.
Utah Code Ann. § 77–13–6 (as amended effective 2003).

---

10. The statute was amended in 2003, in apparent response to the case *State v. Ostler,* 31 P.3d 528, 531 n. 3 (Utah 2001) (30–day period runs from the date of final disposition of the case at the district court and defining "final Disposition" as entry of the final judgment of conviction at the district court."). As amended the statute now specifically addresses pleas in abeyance:

(b) A defendant may plead not guilty, guilty, no contest, . . . .

(c) A defendant may plead no contest only with the consent of the court.

\*       \*       \*       \*       \*       \*

(e) The court may refuse to accept a plea of guilty, no contest or . . ., and *may not accept the plea until the court has found:*

(1) *if the defendant is not represented by counsel, he or she has knowingly waived the right to counsel and does not desire counsel;*

(2) the plea is voluntarily made;

\*       \*       \*       \*       \*       \*

These findings may be based on questioning of the defendant on the record or, if used, a written statement reciting these factors after the court has established that the defendant has read, understood, and acknowledged the contents of the statement.

Utah Rule Crim. P. 11 (underlined emphasis added).

In Mr. Jimenez's case, the plea colloquy reveals that the trial judge complied with Rule 11 in many respects such as informing defendant of the maximum and minimum sentences, the right to trial, the right to have counsel at that trial and to have counsel appointed if he could not afford one. However, the information about an attorney was limited to telling him that he was "entitled to *a speedy public trial with the assistance of an attorney.* If you can't afford one, I would appoint one to represent you."

The trial judge did not inform Defendant that he was entitled to have counsel in the April 12, 1999, hearing *for the purposes of considering his plea.* The trial judge did not ascertain whether Mr. Jimenez, who appeared without counsel at the hearing, had knowingly waived the right to counsel and did not desire counsel for the purpose of the plea hearing.

Defendants rely on the case *Johnson v. U.S.,* 333 F.2d 371 (10th Cir.1964), as authority for the position that the fact that Mr. Jimenez did not have counsel at his arraignment is not material because, at that arraignment, he was not called upon to make any incriminating statement or to waive any constitutional right. The Court finds *Johnson* inapposite because it involved a motion to vacate and set aside a sentence following a jury verdict because criminal defendant did not have counsel at the arraignment. The *Johnson* Court denied the motion, finding no prejudice on the particular facts of the case. 333 F.2d at 373. The Court did note in *Johnson,* that there is a right to have counsel present at the arraignment and in deciding whether or not to plead guilty. *Id.* at 372. *See also Iowa v. Tovar,* — U.S. —, —, 124 S.Ct. 1379, 1389, 158 L.Ed.2d 209 (2004) (court must alert criminal defendant to his right to the assistance of counsel in entering a plea, but need not give a rigid and detailed admonishment of the usefulness of an attorney).

Because this is not an action [11] to set aside his plea or his criminal conviction for lack of effective assistance of counsel, *Johnson* is not helpful. The issue in the

---

**11.** Any such action would have had to have been brought in the Third District Court. *See Manning v. State,* 89 P.3d 196, 207 (Utah Ct.App.2004) (the court who took the plea must be given the first chance to consider

defendant's arguments based on a challenge to that plea). Accordingly, this court expresses no opinion on Plaintiff's contention that the trial judge's failure to inform Mr. Jimenez of his right to counsel would have entitled

present case is the voluntariness of the Release–Dismissal Agreement. That issue does not turn on whether or not Utah's R.Crim. P. 11(a)'s right to counsel before entering plea requirement was met. Instead, the relevance of the lack of advice of rights at the arraignment is that the prosecutor assumed that Rule 11 had been complied with at the arraignment. Therefore Mr. Midgley's assumption was that by the time he was asked to represent Murray City, Mr. Jimenez had already been informed of, and waived, his right to counsel at the arraignment and plea stage, when in fact, he had never been informed of the same. As a result, on April 12, 1999, Mr. Jimenez appeared, negotiated a plea agreement, entered his plea in abeyance, and orally agreed to sign a "hold harmless" agreement that wasn't even drafted yet, all without the Court or the prosecutor advising him of his right to have counsel appointed for the purpose of assisting him at the plea stage.

Thus, as of April 12, 1999, there was no written release, but only an oral agreement to agree to release in the future. However, since the plea was entered, and the time to withdraw the plea expired before the release was reduced to writing, it was an oral agreement that purports to have become absolutely binding on Mr. Jimenez before he ever saw the written Release–Dismissal Agreement. Thus, he bound himself before he was aware of exactly what the "hold harmless" would entail, what rights he was giving up and before he was made aware of the right to counsel to consider it as a condition of the offered plea in abeyance. The binding nature of his oral agreement to enter into the Release–Dismissal Agreement is what the trial judge was referring to on July 7,

him to withdraw the plea after the 30–day

1999, when he explained to Mr. Jimenez that "it was not a matter of going back ... to square one" and that there would be "no trial because a plea has been entered." Similarly, Mr. Rasmussen explained to Mr. Jimenez that the condition of signing a Release–Dismissal Agreement was binding on Mr. Jimenez long before Mr. Rasmussen was appointed because the 30–day period had passed.

In the case, *Livingston v. North Belle Vernon Borough, Livingston I*, 12 F.3d 1205, (3rd Cir.1993), the Court found that there was a genuine issue of material fact as to whether the plaintiffs had made deliberate, informed and voluntary waivers of their right to bring their § 1983 action by entering an oral agreement to do so. In *Livingston I*, as in the present case, the agreement was oral, was put briefly on the record, with no clear on-record statement of the rights the criminal defendant and her husband were agreeing to waive, the discussion was brief and did not establish that the criminal defendant understood the scope of the condition to which she was agreeing.

This case differs from *Livingston I*, because there was never a written release presented to the § 1983 plaintiff in that case. However, the usual advantages resulting from a written release are not applicable to this case because the obligation to sign was incurred before the release was reduced to writing. Those advantages would have been an opportunity for deliberate reflection, opportunity to receive advice of legal counsel, opportunity for modifications and providing evidence of the parties' relative bargaining power. *See Livingston I*, 12 F.3d at 1213.

■ As noted in *Rumery*, advice of counsel is an important element of volun-

period

tariness. The Court can find no case finding a release-dismissal agreement enforceable where the criminal defendant did not have the opportunity for advice of counsel regarding the agreement. *C.f. Vallone v. Lee,* 7 F.3d 196 (11th Cir.1993)(finding no error in instructions to jury that found release involuntary where evidence at trial showed defendant was coerced into signing release because, among other things, the sheriff interfered with criminal defendant's ability to obtain counsel). Where, as in this case, there was no opportunity for advice of counsel before Mr. Jimenez's obligation to sign a release became binding, the Court cannot find that Defendants have met their burden of proving voluntariness by a preponderance of the evidence. Accordingly, the Court will send the issue of voluntariness to the jury.

■ Under the second *Rumery* factor, the Court concludes that there was no prosecutorial misconduct in negotiating the civil release as a condition of the plea in abeyance in this case. Mr. Jimenez was charged with five offenses months before Mr. Midgley was appointed. It wasn't until the scheduled Pretrial Conference hearing on April 12, 1999, that Mr. Jimenez told Mr. Midgley about his potential civil claims. Thus, like *Hammond v. Bales,* this case "is not a case in which the state created a frivolous charge to suppress a valid civil complaint." 843 F.2d 1320, 1323 (10th Cir.1988). *See also Penn v. City of Montgomery,* 273 F.Supp.2d 1229 (M.D.Ala.2003) (no evidence of prosecutorial overreaching or misconduct in obtaining release-dismissal agreement where criminal charges arising from domestic violence charge were brought before civil rights plaintiff articulated any threat to sue the city or its agents).

At the time he proposed the Release–Dismissal Agreement as part of the plea in abeyance, Mr. Midgley had reviewed the substantial evidence supporting the charges-the most compelling being the 911 transcript. In his Complaint, Mr. Jimenez contends that he was wrongly charged. However, making independent determinations about the strength of charges and the cost-benefit analysis of prosecutions are an integral part of the prosecutorial function and, in this case, there was substantial evidence supporting the charges. The Court found, above, that Mr. Midgley had legitimate objectives for seeking a release of liability. He considered Mr. Jimenez's potential claims to be frivolous, but potentially very burdensome to the City and officers in terms of resources to defend against such claims. Even given the inexcusable conduct of Defendants' counsel in this case in concealing the audiotape, there is no evidence that, at the time he negotiated the plea, Mr. Midgley did not have a good faith belief that Mr. Jimenez had been properly advised of and waived his right to counsel when entering his initial not guilty plea at his arraignment.

Mr. Jimenez testified that he told Mr. Midgley his version of why he was innocent, and discussed his claim of damages, but there was no evidence he informed Mr. Midgley of his subsequent position that the officers charged him to cover up their own racially motivated misconduct. Thus, as in *Penn,* 273 F.Supp.2d at 1237, "there is no evidence that [the prosecutor] offered the release-dismissal agreement to cover up what be believed to be civil rights violations." Under these circumstances, the Court finds that there was no prosecutorial misconduct in negotiating the plea in abeyance conditioned upon a release of potential civil liability. *Id.*

■ Under the third *Rumery* factor, the negotiated plea in abeyance condi-

tioned upon a release of civil liability did not adversely affect the relevant public interest. As noted in Justice O'Connor's concurrence in *Rumery:*

> Prosecutors may legitimately believe that, though the policy properly defused a volatile situation by arresting a minor misdemeanant, the public interest in further prosecution is outweighed by the costs of litigation. Sparing the local community the cost of litigation associated with some minor crimes for which there is little or no public interest in prosecution may be a legitimate objective of a release-dismissal agreement.

480 U.S. at 399–400, 107 S.Ct. 1187.

In this case the volatile situation shown by the 911 tapes of December 12, 1998, incident was defused by the arrest, and there appeared to be little but expense to be gained from prosecution of the charged misdemeanors, especially where the chief witness was apparently retracting her story. Certainly, it was well within the prosecutor's sphere of judgment to determine that the public interest was best served by resolving the case with the type of plea in abeyance that, in his considerable past experience, worked most beneficially to resolve domestic dispute cases. In addition, the plea saved taxpayer dollars by avoiding the costs of a criminal jury trial and what the prosecutor believed would be a frivolous civil jury trial. Although Mr. Jimenez disagrees with Mr. Midgley's analysis of the situation at the time of the plea, the evidence is overwhelming that, based upon an objective view of the facts known to Mr. Midgley at the time he made his decision to condition the plea in abeyance on the "hold harmless" agreement, he had analyzed the particular merits of the criminal charges and Mr. Jimenez's potential civil claims and was actually motivated by the public interest considerations he articulated. *Cuba–Diaz v. Town of Windham,* 274 F.Supp.2d 221, 227 (D.Conn. 2003) (prosecutor's individualized analysis required to meet public interest prong of *Rumery*). Further, this is not a case where the public interest is implicated because "it leaves an unremedied civil rights claim." *Rumery* at 394. As noted in *Gonzalez,* where "criminal defendants receive the dismissal of criminal charges against them, and the avoidance of the time and expense of a criminal trial," there is no unredressed violation of their rights because they did receive something of value for the release of their § 1983 claims. 314 F.3d at 320–21. This is particularly true in this case where Mr. Jimenez was unemployed and a criminal conviction could have adversely affected his future job prospects.

## IV. ORDER

For the reasons stated above, voluntariness—the first *Rumery* factor—will be determined by the jury. However, the second and third factors of the *Rumery* analysis are issues of law and this Court has determined those issues in Defendants' favor. Accordingly, it is therefore

ORDERED that Defendants' Motion to Enforce the Release–Dismissal Agreement is DENIED. It is further

ORDERED that, within 30 days of the entry of this Order, the parties shall file simultaneous memoranda addressing Defendant Midgley's Motion for Summary Judgment based on absolute immunity, in light of the Court's findings and conclusions. Optional replies may be filed no late than 15 days thereafter. It is further

ORDERED that this case will be referred to the magistrate judge for a scheduling conference.